882 A.2d 849

**PUBLIC SERVICE COMMISSION OF MARYLAND, and Kenneth D. Schisler, Chairman of the Public Service Commission of Maryland**

v.

**Chrys WILSON.**

**No. 133, Sept. Term, 2004.**

Court of Appeals of Maryland.

Sept. 13, 2005.

30

Susan Stevens Miller, General Counsel (Public Service Commission of Maryland, Baltimore), on brief, for appellants.

Cary J. Hansel (Timothy F. Maloney of Joseph, Greenwald & Laake, P.A., Greenbelt), on brief, for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

We are called upon in this case to review the termination, brief reinstatement, and re-termination of Chrys Wilson in her employment with the Maryland Public Service Commission. In evaluating the propriety of these actions, we first must determine whether the Chairman of the five member Commission, Kenneth D. Schisler, exceeded his authority when, on his initiative, he terminated Wilson without the approval, acquiescence, or delegation of authority of a majority of the full

membership of the Commission. We also must determine whether the Circuit Court erred in concluding that, as to the initial termination or re-termination, Wilson was terminated "for cause" and was thus entitled to the statutory protections of Md.Code (1993, 2004 Repl.Vol.), § 11–106 of the State Personnel and Pensions Article. Finally, we must determine, assuming Wilson was discharged simply because she served at the pleasure of the appointing authority, whether the Circuit Court erred in finding that the administrative appeal process provided by statute for such a termination violated due process principles because it only provides for an appeal to the Chairman of the Commission, who, in this case, made the initial decision to terminate Wilson and participated as a member of the Commission in the re-termination action as well.

## I.

On 15 April 2004, without prior notice that such an action was forthcoming, Chrys Wilson was terminated from her employment as Manager of the Office of External Relations with the Maryland Public Service Commission ("PSC"), a position that she held since 1996. Wilson's termination took place at the same time four other non-temporary employees of the Commission were removed.[1]

The decision to terminate Wilson was made by the Chairman of the Commission, Kenneth D. Schisler.[2] Although Chairman Schisler, in making this personnel decision, allegedly consulted individuals outside of the PSC, he did not seek approval from the other members of the Commission, which consists of five Commissioners (including the Chairman).[3]

---

1. None of the other employees is a party to the present litigation.

2. Schisler was appointed to the position of Chairman of the Commission by Governor Robert L. Ehrlich, Jr. He assumed the position on 1 July 2003.

3. At the time of the initial termination of Wilson, the five Commission members were Chairman Schisler, Commissioner Gail C. McDonald,

In a deposition taken by Wilson on 27 September 2004 in the present litigation, Chairman Schisler stated that, prior to Wilson's termination, he felt that she did not possess sufficient skills, judgment, or work ethic to perform in her position at the level he desired. He also stated that he suspected that, on one occasion, she may have misrepresented on her time sheet the amount of time she actually worked on a given day. The Chairman, however, claimed to have concluded ultimately, as to the time sheet incident, that there was insufficient evidence of wrongdoing and, for that reason, he neither sought nor imposed any disciplinary sanctions. Chairman Schisler denied in his deposition that he based his termination decision on any performance issues or the incident involving the time sheet. Instead, he pointed out that he did not need to give a reason for Wilson's termination because of her status as an at-will employee. Indeed, Chairman Schisler's 15 April 2004 memorandum to Wilson advising her of her termination assigned no reason for the action.

At the request of the group of terminated PSC employees and a member of the Legislature, on 27 April 2004 an Assistant Attorney General of Maryland issued an advice letter analyzing the authority of the Chairman to terminate certain employees without the approval of the full Commission. This letter concluded that, under the relevant statutory scheme, the termination of an employee in the management service [4] may only be effectuated by the "appointing authority," which by statute possesses the exclusive power to terminate certain at-will employees of the PSC. The Assistant Attorney General concluded that the five Commissioners, as a body, constituted

---

Commissioner J. Joseph "Max" Curran, III, Commissioner Ronald A. Guns, and Commissioner Harold D. Williams.

**4.** As explained *infra*, positions within the State Personnel Management System are classified into six distinct categories: skilled service, professional service, management service, executive service, special appointments, and temporary employees. Although Wilson appears to have been initially of the belief that her position was not within the management service, *see infra* note 6, on appeal she appears to concede that her former position was indeed within the management service.

the "appointing authority" of the PSC. The Chairman of the Commission, she concluded, possesses the authority to terminate a management service employee "only if [that authority] has been delegated to him [or her] by the Commission as a whole." If such a delegation has not been made, the letter opined, the termination of the affected employees would be outside the Chairman's authority and therefore illegal.

Also on 27 April 2004, Wilson apparently filed with the Commission an administrative appeal of her termination pursuant to Md.Code (1993, 2004 Repl.Vol.), § 11–113 of the State Personnel and Pensions Article,[5] on the grounds that her termination was illegal and unconstitutional.[6] Two days later, three of the Commissioners serving on the Commission at the time of the termination of Wilson signed an affidavit stating that they "did not participate in or direct the termination of [the five employees, including Wilson, terminated by Chairman Schisler on 15 April 2004]," nor did they delegate to Chairman Schisler "any authority to terminate the employment of the aforementioned employees." Nonetheless, on 12 May 2004, Chairman Schisler, as "head of the principal unit," [7] reviewed, in light of the apparent issues raised in her appeal, his decision to terminate Wilson and denied her administrative

---

5. Unless otherwise indicated, all subsequent statutory references shall be to the 2004 replacement volume of the State Personnel and Pensions Article.

6. Although we are unable to locate in the record the actual written appeal filed by Wilson, Chairman Schisler's written response to her appeal recites the grounds upon which he perceived Wilson challenged her termination by him:

 1) the position of Manager of External Relations is not a management service position subject to the at-will termination provisions of SP & P § 11–305; 2) she was not afforded a pre-termination hearing; 3) her termination was because of her political affiliation, belief or opinion, contrary to the "First Amendment and Article [40] of the Maryland Declaration of Rights"; and 4) the Chairman's actions as appointing authority for the Commission were unlawful and without authority.

7. Wilson does not dispute that Chairman Schisler is, with regard to the Commission, the embodiment of the statutory "head of the principal unit."

appeal. In a letter explaining his reasons for denying her appeal, the Chairman concluded that, as a management service employee, Wilson was an at-will employee, was not fired "for cause," and therefore not entitled to a statutory pre-termination hearing. In regard to her First Amendment claim, Chairman Schisler found that Wilson had not presented sufficient evidence that she had been terminated as a result of her political affiliation, opinions, or beliefs. He also concluded that the position of Chairman was the "appointing authority" for the Commission and therefore his exercise of that authority, without approval, acquiescence, or delegation from the full Commission, was not illegal or unconstitutional.

Aggrieved by the outcome of the administrative appeal, on 27 May 2004 Wilson filed a ten count complaint in the Circuit Court for Baltimore City seeking essentially declaratory and injunctive relief, including reinstatement as Manager of the Office of External Relations. The PSC (and Chairman Schisler) and Wilson filed cross-motions for summary judgment. On 19 October 2004, one day before the hearing on the motions, Wilson filed an amended complaint, adding significant additional factual allegations and causes of action, but abandoning others.[8] In her amended complaint and motion for summary judgment, Wilson claimed that her termination was illegal because it was accomplished by the Chairman acting alone, without the approval, acquiescence, or delegation of authority by at least a majority of the full Commission. Wilson also contended that, despite Chairman Schisler's statements to the contrary at his deposition, she was terminated "for cause" and therefore unlawfully was denied the pre-termination process guaranteed by § 11–106 before disciplinary sanctions relating to "employee misconduct" could be imposed. Wilson also alleged that, in the alternative, she was terminated unconstitutionally because of her political beliefs, in violation of Article 40 of the Maryland Declaration of

---

8. Wilson amended her complaint in light of the deposition she took of Chairman Schisler conducted subsequent to filing the original complaint. Furthermore, the amended complaint deleted the State of Maryland as a named defendant.

Rights.[9] Furthermore, Wilson maintained that, if she was discharged merely as an at-will employee, and not for cause, the PSC violated her due process rights by failing to provide an impartial agency adjudicator for her post-termination administrative appeal.

The scheduled hearing on the summary judgment motions was held in the Circuit Court, notwithstanding the filing of the amended complaint only a day earlier. On 25 October 2004, the court entered an order containing the following determinations:

(1) within the context of the definition of Appointing Authority, the full panel of [the] Public Service Commission comprises a unit of government; (2) the full panel of the Public Service Commission shall act as the Appointing Authority for the Commission unless the authority is delegated by a majority vote of the Commission; (3) the Chairman had neither been delegated the authority to act as the Appointing Authority by the majority of the Commission at the time Chrys Wilson was terminated; nor had a majority of the Commission acquiesced in the Commission's termination of Chrys Wilson; (4) in light of the foregoing, the termination of Chrys Wilson on April 29, 2004, by the Chairman of the Public Service Commission was unlawful; (5) termination of [Wilson] may only be accomplished by the delegated Appointing Authority, and in the absence of such delegation, a majority vote of the Commission as a whole; [and] (6) neither the Chairman nor any of his employees may lawfully serve as an agency adjudicator regarding his own decision to terminate [Wilson].

The Circuit Court granted Wilson's motion for summary judgment, denied all of the Commission's pending motions,

9. Maryland Declaration of Rights, Article 40, states:
 **Article 40. Freedom of press and speech.**
 That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege.

and ordered that Wilson be reinstated immediately to her prior position with full back pay from the date of termination. The Circuit Court also directed that "any further personnel actions related to Chrys Wilson ... be consistent with the Court's ruling...."

On 29 October 2004, the Commission sent a letter to Wilson stating:

[w]hile the Commission respectfully disagrees with the [Circuit] Court's determination and intends to note an appeal, the Commission currently is bound by the directive. Therefore, the Commission hereby reinstates Ms. Chrys Wilson to the position of the Manager of External Relations effective October 29, 2004.

The letter continued, however, in a not so conciliatory way:

Furthermore, the Commission hereby notifies Ms. Wilson that she is being terminated from her Management Service position with the Maryland Public Service Commission effective October 29, 2004. Ms. Wilson is directed not to report to work. Ms. Wilson is hereby granted administrative leave for October 29, 2004.

In accordance with § 11–113 of the [State Personnel and Pensions Article], Ms. Wilson may appeal the termination by filing a written appeal within 15 days of receipt of this decision. The appeal should be directed to the head of the principal unit and may only be based on the grounds that the action was illegal or unconstitutional.

The letter was signed by three Commissioners, including one, Allen M. Freifeld, who was newly appointed to the Commission since Wilson's initial termination.[10]

On 3 November 2004, the Commission noted an appeal to the Court of Special Appeals regarding the Circuit Court's grant of summary judgment in favor of Wilson. The Commission contemporaneously filed a motion in the Circuit Court asking it to reconsider its award of back pay and benefits. On

---

10. On 1 July 2004, Commissioner McDonald was replaced by Commissioner Freifeld.

4 November 2004, Wilson petitioned the Circuit Court to hold the Commission in contempt of the court's 25 October 2004 order based on the re-termination. Several days later, the Circuit Court held a hearing on the pending motions. In an order dated 15 November 2004, the Circuit Court denied, without prejudice, Wilson's petition to hold the Commission in contempt. In the same order, however, the trial judge amended his 25 October 2004 order, retaining the first three determinations, but adding certain new findings:

. . . 4) the termination of Chrys Wilson on April 15, 2004, by the Chairman of the Public Service Commission was unlawful in that it was a for cause termination as a result of alleged misconduct which was conducted without the statutory protections due Ms. Wilson; 5) in light of the foregoing, the termination of Chrys Wilson on April 15, 2004, by the Chairman of the Public Service Commission was unlawful; 6) any termination of [Wilson] may only be accomplished by the delegated Appointing Authority, and in the absence of such a delegation, a majority vote of the Commission as a whole; 7) [Wilson] is entitled to an impartial, unbiased agency adjudicator in connection with any intra-agency appeal of a proposed termination; 8) neither the Chairman nor any of his employees may lawfully serve as an agency adjudicator regarding his own decision to terminate [Wilson]; 9) the October 29, 2004 re-termination of [Wilson] was invalid, illegal and improper because it was tainted by the initial unlawful termination; 10) the October 29, 2004 re-termination of [Wilson] was invalid, illegal and improper because it was a for cause termination as a result of alleged misconduct carried out without the statutory protections required; 12) the October 29, 2004 re-termination of [Wilson] was invalid, illegal and improper because the Commission adopted the same unconstitutional intra-agency appellate procedure by a biased decision-maker applied in the initial termination. . . .

In addition to the relief afforded in the original 25 October 2004 order (*i.e.,* reinstatement, back pay, and benefits), the judge ordered that Wilson be "permitted to physically return

to work and perform the duties of her position as Manager of External Relations...." Furthermore, the judge ordered that, "before the Public Service Commission makes additional efforts, if any, to terminate Ms. Wilson's employment, Ms. Wilson shall be provided a hearing and all process due according to law pursuant to her rights as an individual being terminated for cause as a result of alleged misconduct, this shall include, but not be limited to, the rights found in Section 11–106 of the State Personnel and Pensions Article."

In response to entry of the 15 November 2004 order, the Commission filed a second notice of appeal to the Court of Special Appeals. Before the intermediate appellate court could consider either appeal,[11] this Court, on its initiative, issued a writ of certiorari, 385 Md. 161, 867 A.2d 1062 (2005), in order to consider the following questions:

I. Did the Circuit Court err when, on 15 November 2004, it altered its previous order of 25 October 2004 granting summary judgment in favor of Wilson based on the intervening actions of the Commission?

II. Did the Circuit Court err in determining that the Commission as a whole is the "appointing authority" under Md.Code (1993, 2004 Repl.Vol.), § 11–305 of the State Personnel and Pensions Article and that, as a result, a termination effectuated by the Chairman of the Commission acting alone, without the approval, acquiescence, or delegation of a majority of the full Commission, is unlawful?

III. Did the Circuit Court err in determining that Wilson was terminated "for cause" and thus was entitled to the statutory process under Md.Code (1993, 2004 Repl.Vol.), § 11–106 of the State Personnel and Pensions Article appli-

---

11. Prior to entry of the Circuit Court's 15 November 2004 order, the Commission, on 12 November 2004, filed an emergency motion in the Court of Special Appeals for a stay of that part of the Circuit Court's order allowing Wilson to "physically return to work," which was granted by Chief Judge Joseph F. Murphy, Jr. that same day. On 23 November 2004, after considering Wilson's opposition, Chief Judge Murphy issued an order making the stay permanent abiding the outcome of the appeals. The stay was not altered by this Court.

cable to the imposition of disciplinary sanctions for "employee misconduct"?

IV. Did the Circuit Court err in determining that the statutory intra-agency appeals process under Md.Code (1993, 2004 Repl.Vol.), §§ 11–305 and 11–113 of the State Personnel and Pensions Article governing the termination of certain employees violated Article 24 of the Maryland Declaration of Rights because it failed to provide an impartial adjudicator?

V. Did the Circuit Court exceed its authority when it ordered that Wilson be allowed to "physically return to work" after her termination was found to be unlawful?

## II.

The Commission initially argues that the Circuit Court exceeded its authority by *sua sponte* granting summary judgment in favor of Wilson in its 15 November 2004 order and vacating the Commission's 29 October 2004 re-termination of Wilson. For reasons to be explained, we conclude that the Circuit Court committed no procedural error because, despite the Commission's characterization of the action taken, the Circuit Court acted within the proper range of its revisory powers under the relevant provisions of the Courts and Judicial Proceedings Article of the Maryland Code and the Maryland Rules.

As indicated *supra*, the Circuit Court, on 25 October 2004, granted Wilson's motion for summary judgment, finding that both the 15 April 2004 termination of Wilson and the subsequent intra-agency administrative appeal process were unlawful. Based on a post-judgment motion by the Commission to reconsider the award of back pay, the Circuit Court scheduled and held a hearing on 10 November 2004. The Circuit Court also allowed Wilson, at the hearing, to be heard on her contempt motion filed a few days before. Based on what was presented to it at the 10 November hearing, including what transpired since the 20 October hearing upon which the 25 October order was based, the trial judge, on 15 November

2004, issued an order mirroring to some extent the language of his 25 October order, but adding several additional determinations. Most notable of the additions was the finding that both the 15 April and 29 October terminations were "for cause" and thus unlawful because they were accomplished without the statutory protections due an employee that is terminated for "employee misconduct."

Our review of the record indicates that the 15 November order was not in fact a *sua sponte* grant of summary judgment, as the Commission contends, but rather a modification of the 25 October order granting Wilson's motion for summary judgment. Md.Code (1973, 2002 Repl.Vol.), § 6–408 of the Courts and Judicial Proceedings Article states:

### § 6–408. Revisory power of court over judgment.

For a period of 30 days after the entry of a judgment, or thereafter pursuant to motion filed within that period, the court has revisory power and control over the judgment. After the expiration of that period the court has revisory power and control over the judgment only in case of fraud, mistake, irregularity, or failure of an employee of the court or of the clerk's office to perform a duty required by statute or rule.

Maryland Rule 2–535(a) states:

### Rule 2–535. Revisory power.

(a) **Generally.** On motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment and, if the action was tried before the court, may take any action that it could have taken under Rule 2–534 [Motion to alter or amend a judgment—Court decision].

Maryland Rule 2–534 provides:

### Rule 2–534. Motion to alter or amend a judgment—Court decision.

In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the

decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment. A motion to alter or amend a judgment may be joined with a motion for new trial.

In *Maryland Board of Nursing v. Nechay*, 347 Md. 396, 701 A.2d 405 (1997), we examined a Circuit Court's power to revise, *sua sponte*, an order within 30 days of its entry when there existed no intervening motion between the original entry of judgment and the subsequent revision or modification of the order underlying the judgment. Noting that the Committee note to Rule 2–535(a) states that "[t]his section is intended to be as comprehensive as Code, Courts Article § 6–408," the Court concluded that

> [t]his suggests strongly that when the Court adopted [Rule 2–535(a)], it did not intend that the rule supercede the statute or even contradict it; rather it intended that they be read together, complementing or supplementing each other. This is consistent with the teachings of our cases with respect to the power of circuit courts to revise or modify their judgments. In that regard, it is well settled in this State that, "Read together, the rules, the statute and our decisions boil down to a dictate that for a period of thirty days from the entry of a law or equity judgment a circuit court shall have 'unrestricted discretion' to revise it." . . . The exercise of the court's discretion is not triggered exclusively, our cases make clear, by a motion filed by one of the parties.

*Nechay*, 347 Md. at 408–09, 701 A.2d at 411 (citations omitted). *See also Renbaum v. Custom Holding, Inc.*, 386 Md. 28, 43–46, 871 A.2d 554, 563–65 (2005) (finding that, where the Circuit Court initially denied a plaintiff's petition for involuntary dissolution of a corporation, the Circuit Court did not err when, upon motion of the plaintiff pursuant to Rule 2–534, it relied on evidence of events occurring post-judgment to conclude subsequently that involuntary dissolution was proper).

In this case, the Circuit Court was invited by the Commission's motion seeking revision, alteration, or amendment, filed within 10 days of the entry of the 25 October order, to reconsider certain aspects of that order, *i.e.*, back pay and benefits. Although expanding the array of what was reconsidered beyond the scope of that sought in the Commission's motion, the Court entered its revised order on 15 November 2004, less than 30 days after the entry of the 25 October 2004 order. Thus, even had no party invoked the court's revisory powers by motion, under § 6–408 of the Courts and Judicial Proceedings Article, Rule 2–535(a), Rule 2–534, and the principles articulated in *Nechay* and *Renbaum,* we conclude that the Circuit Court did not err as a matter of procedure in revising and modifying its 25 October 2004 order.

### III.

The Commission next argues that the Circuit Court erred in concluding that the termination of Wilson on 15 April 2004 was illegal because: 1) the termination decision was not made by the full Commission; 2) she was not afforded the statutorily-mandated procedures for terminations resulting from "employee misconduct;" and, 3) the statutory termination appeal process violated due process because it did not provide for an impartial adjudicator. We need not reach, at this point at least, the latter two issues because we conclude that Chairman Schisler acted outside of his authority when, without the approval, acquiescence, or delegation of authority from a majority of the full Commission, he alone terminated Wilson.

### A.

The question of whether Chairman Schisler, acting alone, possessed the authority, as "appointing authority," to terminate Wilson without the involvement of the full Commission is one of statutory interpretation and, as such, is purely a legal one. *Mohan v. Norris,* 386 Md. 63, 66–67, 871 A.2d 575, 577 (2005). We therefore review the judgment of the Circuit Court *de novo. Id.; see also Davis v. Slater,* 383 Md. 599,

604, 861 A.2d 78, 80–81 (2004) (stating that "[b]ecause our interpretation of the Maryland Declaration of Rights and Constitution, provisions of the Maryland Code, and the Maryland Rules are appropriately classified as questions of law, we review the issues *de novo* to determine if the trial court was legally correct in its rulings on these matters").

## B.

### 1.

The PSC was established in 1910 by the Legislature as an independent unit in the Executive branch of State government. Md.Code (1998, 2004 Supp.), § 2–101 of the Public Utility Companies Article ("PUC"). It has "jurisdiction over each public service company that engages in or operates a utility business in the State and over motor carrier companies as provided in Title 9 [Carrier Companies] of [the Public Utility Companies Article]." PUC § 2–112. Section 2–113(a)(1) of the PUC sets forth a non-exhaustive list of the duties of the PSC:

> (i) supervise and regulate the public service companies subject to the jurisdiction of the Commission to:
>
> 1. ensure their operation in the interest of the public; and
>
> 2. promote adequate, economical, and efficient delivery of utility services in the State without unjust discrimination; and
>
> (ii) enforce compliance with the requirements of law by public service companies, including requirements with respect to financial condition, capitalization, franchises, plant, manner of operation, rates, and service.

Pursuant to the statutory scheme, the governing body of the PSC, the Commission, "consists of five commissioners, appointed by the Governor with the advice and consent of the Senate." PUC § 2–102. The Governor also designates one commissioner to hold the position of Chairman. PUC § 2–103. Each of these positions, including the Chairman, serves

in his or her respective position for a staggered term of five years. PUC § 2–102; § 2–103. A Commissioner may only be removed from his or her position by the Governor for incompetence or misconduct in accordance with § 3–307 of the State Government Article [Complaints against civil or military officers]. PUC § 2–102.

2.

Title 11, Subtitle 3 of the State Personnel and Pensions Article, entitled "Employment Separations and Terminations," covers all aspects of termination and separation of employment for all non-temporary employees in the State Personnel Management System. § 11–301. Section 11–305 sets forth the termination procedures and protections that apply to certain non-probationary employees:

**§ 11–305. Termination of other [non-probationary] employees.**

(a) *Applicability of section.*—This section only applies to an employee who is in a position:

 (1) under a special appointment; or

 (2) in the management service; or

 (3) in the executive service.

(b) *Employee at will.*—Each employee subject to this section:

 (1) serves at the pleasure of the employee's appointing authority; and

 (2) may be terminated from employment for any reason, solely in the discretion of the appointing authority.

(c) *Appeal.*—An employee or an employee's representative may file a written appeal of an employment termination under this section as described under § 11–113 of this title.

■ This statute states clearly that the termination of a management service employee may be effectuated only by the "appointing authority" of an agency. Wilson and the Commis-

sion agree that she, as a management service employee,[12] was subject to the termination procedures outlined in § 11–305(b)(2) and thus only may be terminated by the "appointing authority." Wilson and the Commission differ, however, in their respective views as to who or what constitutes the "appointing authority" in this matter.

## C.

The Commission argues that the Circuit Court erred in concluding that the "appointing authority" in this matter is not the Chairman but rather, as Wilson contended, the full membership of the Commission (by at least a vote of a majority of the five Commissioners). In determining who or what is the "appointing authority," our starting point is the plain language of the relevant statutes. *See Johnson v. Mayor of Baltimore,* 387 Md. 1, 23–24, 874 A.2d 439, 453 (2005) (stating that "the best source of legislative intent is the statute's plain language and when the language is clear and unambiguous, our inquiry ordinarily ends there").

## 1.

Although "appointing authority" is not defined in Title 11 of the State Personnel and Pensions Article, that term is defined in § 1–101(b). Section 1–101(b) defines "appointing authority" as "an individual or a unit of government that has the power to make appointments and terminate employment." Although this definition appears somewhat circular and redundant in its application to § 11–305(b)(2), the Commission points to the legislative history of that definition in support of its contention that the "appointing authority," with regard to the Commis-

---

12. Although it appears that, during her intra-agency administrative appeal following the initial termination, Wilson challenged her classification as a management service position employee and her status as an at-will employee, no real arguments to that effect were raised in the Circuit Court or here. In any event, the record demonstrates that Wilson's position, Manager of the Office of External Relations (officially classified as Administrative Program Manager II), was reclassified in 1996 from a skilled service to a management service classification.

sion, is the Chairman. In 1993, the definition, found prior to that time in Md.Code (1957, 1988 Repl.Vol., 1992 Cum.Supp.), Art. 64A, § 1(1), was recodified as part of the State Personnel and Pensions Article. 1993 Md. Laws, Chap. 10. The Revisor's Note accompanying § 1–101(b) in the 1993 edition of the State Personnel and Pensions Article states:

This subsection [§ 1–101(b)] is new language derived without substantive change from former Art. 64A, § 1(1).

The reference to an "individual" and a "unit of government" are substituted for the former references to a "person" for clarity. The term "person", as defined in subsection (h) of this section [codified in the 2004 replacement volume of the State Personnel and Pensions Article as § 1–101(i)], expressly excludes governmental entities or units. On the other hand, a board, committee, or other governmental unit, which is thus excluded from the definition of the term "person", might well be designated by some other law as an appointing authority. Accordingly, the term "unit" is necessary to accommodate that situation.

█ The Commission seizes upon the language in the Revisor's Note and certain case law to argue that the "appointing authority" is "an individual unless a statute expressly names the unit of government as the appointing authority instead." *See E. Corr. Inst. v. Howe,* 105 Md.App. 167, 172, 658 A.2d 1182, 1184 (1995) (construing § 1–101(b) and its Revisor's Note to mean that "the term 'appointing authority' contemplates a person with authority to make appointments, or a unit of government that has been given that express authority by statute"). Although § 1–101(b) and *Howe* provide that an individual *may* be the "appointing authority," we disagree with the Commission's interpretation that, in the absence of a statute expressly naming a governmental unit as the "appointing authority," an individual *must* be the "appointing authority." The language in *Howe* must be viewed in the context of the statutory scheme implicated in that case. In *Howe,* an individual was named expressly in the relevant statute as the "appointing officer." 105 Md.App. at 169–70, 658 A.2d at 1183 (citing Md.Code (1957, 1992 Repl.Vol., 1994 Cum.Supp.), Art.

27, § 684(b)(2) (designating the "warden or superintendent of each institution [as] the appointing officer for employees of that institution, and the Commissioner [as] the appointing officer for all other employees in the Department")). When there is no statute or agency regulation identifying specifically who or what is the "appointing authority," however, we interpret § 1–101(b) and its legislative history to indicate that the "appointing authority" may be either an individual *or* a unit of government, without presumption as to either.[13] Because, with regard to the Commission, there is no statute relating expressly to the "appointing authority," it is therefore necessary for us to delve deeper to determine who or what is the "appointing authority" in this case.

## 2.

■ Wilson argues that, by examining other statutes that relate to the Commission, we should arrive at the conclusion that the five member Commission is the statutory "appointing authority." Wilson relies specifically on § 2–108(d) of the PUC Article, which, in full context, states:

**Title 2. Public Service Commission and People's Counsel.**

**Subtitle 1. Public Service Commission.**

**§ 2–108. Office; meetings; seal; staff.**

(d) *Staff.*—(1) The State budget shall provide sufficient money for the Commission to hire, develop, and organize a

---

13. In arguing that there is a presumption that the "appointing authority" is an individual, rather than a unit of government, the Commission does not address the fact that the definition of "appointing authority" as a "person" was only in effect for a short time. Prior to 1988, Md.Code (1957, 1988 Repl.Vol.), Art. 64A, § 1 defined "appointing authority" as "any commission, board or officer having power to make appointments." In 1988, the former Art. 64A, § 1 was repealed and replaced with a new set of definitions. 1988 Md. Laws, Chap. 543. Md.Code (1957, 1988 Repl.Vol., 1992 Cum.Supp.), Art. 64A, § 1(1), defined "appointing authority" as "a person having the power to make appointments and to terminate employment." Finally, in 1993, the definition was amended again to reflect its current language. 1993 Md. Laws, Chap. 10.

staff to perform the functions of the Commission, including analyzing data submitted to the Commission and participating in proceedings as provided in § 3–104 of this article.

(2)(i) As the Commission considers necessary, the Commission shall hire experts including economists, cost of capital experts, rate design experts, accountants, engineers, transportation specialists, and lawyers.

(ii) To assist in the regulation of intrastate hazardous liquid pipelines under Title 11, Subtitle 2 of this article, the Commission shall include on its staff at least one engineer who specializes in the storage of and the transportation of hazardous liquid materials by pipeline.

(3) The Commission may retain on a case by case basis additional experts as required for a particular matter.

(4) The lawyers who represent the Commission staff in proceedings before the Commission shall be appointed by the Commission and shall be organized and operate independently of the Office of General Counsel.

(5)(i) As required, the Commission shall hire hearing examiners.

(ii) Hearing examiners are a separate organizational unit and shall report directly to the Commission.

(6) The Commission shall hire personal staff members for each commissioner as required to provide advice, draft proposed orders and rulings, and perform other personal staff functions.

(7) Subject to § 3–104 of this article, the Commission may delegate to a commissioner or personnel the authority to perform an administrative function necessary to carry out a duty of the Commission.

(8) (i) Except as provided in paragraph (ii) of this item or otherwise by law, all personnel of the Commission are subject to the provisions of the State Personnel and Pensions Article.

(ii) The following are in the executive service, management service, or are special appointments in the State Personnel Management System:

1. each commissioner of the Commission;

2. the Executive Director;

3. the General Counsel and each assistant general counsel;

4. the Executive Secretary;

5. the commissioners' personal staff members;

6. the chief hearing examiner; and

7. each license hearing officer.

This provision, Wilson argues, indicates that it is the five member Commission, rather than the Chairman alone, that is the "individual or . . . unit of government that has the power to make appointments and terminate employment." § 1–101(b). We agree. Language appears throughout the statute authorizing the Commission to "hire" or "appoint" all types of employees of the PSC. In contrast, there is no mention in this statute, nor any other statute we could find, of language that outlines the Chairman's authority, independent of the Commission's, to "hire" or "appoint" employees of the PSC. Although PUC § 2–108(d) does not discuss specifically the authority of the Commission to terminate employees, PUC § 2–108(d) states that "all personnel of the Commission are subject to the provisions of the State Personnel and Pensions Article." That Article governs the termination of PSC employees, specifically those employees in the executive and management services, and those who are special appointments, all of which "serve[ ] at the pleasure of the employee's appointing authority" and "may be terminated from employment for any reason, solely in the discretion of the appointing authority." § 11–305. Because PUC § 2–108(d) constructs a statutory scheme outlining both the Commission's explicit authority to hire and implicit authority to terminate employees of the PSC, we conclude that the Commission as a whole is the "appointing authority."

3.

The Commission maintains, however, that Wilson's interpretation of PUC § 2–108(d) is incorrect because it would serve

to render other provisions of the PUC Article superfluous. *See Smack v. Dep't of Health & Mental Hygiene*, 378 Md. 298, 305, 835 A.2d 1175, 1179 (2003) (stating that "statutes are to be interpreted so that no portion is rendered superfluous or nugatory"). The Commission points out that the PUC Article specifically authorizes the Commission to appoint four positions: the Executive Secretary, PUC § 2–104; the Executive Director, PUC § 2–105; the General Counsel, PUC § 2–106; and the License Hearing Officer, PUC § 10–110 (the "statutory positions"). Each position serves "at the pleasure of the Commission." The Commission argues that, if we adopt Wilson's interpretation of PUC § 2–108(d), "the Commission would have the authority to appoint all positions and all at-will employees would [therefore] serve at the pleasure of the entire Commission even without these four sections." Wilson's interpretation, the Commission protests, therefore renders the four provisions in PUC § 2–104, PUC § 2–105, PUC § 2–106, and PUC § 10–110 superfluous and unnecessary.[14]

---

14. The Commission also argues that its interpretation is supported by analyzing the predecessor to § 2–108(d), which was enacted in 1976. 1976 Md. Laws, Chap. 756. This statutory language, of which one purpose was that of "providing procedures for the appointment of Commission members," provides:

16.
(A) The annual budget shall provide sufficient funds for the Commission to hire, develop, and organize a staff to perform its functions under this Article, including but not limited to the analysis of all data submitted to the Commission and the preparation of a staff position in matters pending before the Commission. *The staff shall include but not be limited to economists, cost of capital experts, rate design experts, accountants, engineers, transportation specialists, lawyers, and any other experts deemed necessary to meet the needs of the Commission.* The Commission may, from time to time, retain additional experts as required for a particular matter. Those lawyers who represent the Commission staff in proceedings before the Commission shall be organized and operate independently of the Office of General Counsel.
(B) The Commission shall hire hearing examiners to the extent required. Hearing examiners shall constitute a separate organizational unit reporting directly to the Commission and shall perform no other staff functions than those relating to hearings.

This redundancy, if any exists, has no effect on our reasoning. Each of the four statutory provisions outlines the specific attributes and capabilities of the four statutory positions. These specific provisions represent merely the design of the Legislature to designate specific positions and how they function within the hierarchy and mission of the PSC. Section 2–108(d) of the PUC, on the other hand, is a broad statute intended to delegate sweeping authority to the Commission to effectuate the hiring of any and all positions necessary for operation of the PSC, including those positions that were not contemplated or considered by the Legislature at the time of enactment of the sections discussed here.

---

(C) The Commission shall hire personal staff for the Commissioners to the extent required to advise Commissioners, draft proposed orders and rulings, and perform other personal staff functions.

(D) Subject to the restrictions of § 20, the Commission may delegate to any Commissioner or personnel of the Commission the authority to perform any administrative function necessary to the execution of the Commission's duties under this Article.

1976 Md. Laws, Chap. 756.

One year later, the Legislature struck the language italicized above, instead placing the following language in its place:

THE COMMISSION SHALL HIRE economists; cost of capital experts; rate design experts; accountants; engineers; transportation specialists; lawyers; and any other experts deemed necessary to meet the needs of the Commission; OR, AS REQUIRED, RETAIN SUCH PERSONS ON A CASE BY CASE BASIS.

1977 Md. Laws, Chap. 635.

The Commission argues that "the intent of the additional language stating that the Commission 'SHALL HIRE' was to remove the Commission's discretion with regard to whether such staff should be hired. No reasonable reading of this provision could result in the conclusion that the General Assembly was designating the five-member body as the Appointing Authority." We view the Commission's argument as misguided. Although the 1977 legislation required the Commission to hire the enumerated positions and experts, the essence of an "appointing authority" is not necessarily the authority to determine *which* positions for which to hire, but rather *who* is hired for the particular positions. This amendment is no different from the statutes in the PUC Article mandating that the Commission appoint an executive secretary, executive director, general counsel, and license hearing officer. Simply because the Legislature identifies certain positions it deems to be essential to the operation of a particular agency does not abrogate or negate the authority and discretion of the "appointing authority" to select the specific persons to be employed in those capacities.

The Commission, in arguing that the language in those provisions becomes superfluous, emphasizes that the "serves at the pleasure of the Commission" provision was added to PUC § 2–106, the statute governing the appointment of the General Counsel, in the same legislation that adopted the original § 2–108. 1976 Md. Laws, Chap. 756. We conclude, however, that the addition of language stating that each statutory position "serves at the pleasure of the Commission" was necessary to indicate that, unlike some other specifically authorized appointed positions, these positions would not have any set term, but rather would be subject to termination as the Commission saw fit.[15] This is evidenced by the subheading "Term" in each of the respective statutes, with the exception of the License Hearing Officer, preceding the language stating that the statutory positions "serve[ ] at the pleasure of the Commission."

Adopting the Commission's interpretation of "appointing authority" would create a conflict between the statutory provisions of PUC § 2–108(d), § 11–305, and the enabling statutes for the statutory positions. Section 2–108(d) of the PUC provides that the statutory positions of Executive Secretary, Executive Director, General Counsel, and License Hearing Officer are subject to § 11–305, which in turn states that these positions "serve[ ] at the pleasure of the employee's appointing authority." Each of these pertinent statutes, however, establishes that each position serves at the pleasure of the Commis-

---

**15.** We draw no conclusion from an analysis of when the "serves at the pleasure of the Commission" language was added to each of the other relevant statutes. In the case of the statute authorizing the appointment of the Executive Secretary, the relevant language was added in 1998 upon the recodification of Article 78 into the Public Utility Companies Article. 1998 Md. Laws, Chap. 8. Although such language was absent from the respective provision in Article 78, the Revisor's Note states that the phrase, "serves at the pleasure of the Commission," is "new language added for clarity reflecting the transfer of the Executive Secretary to the Executive Pay Plan." The relevant language, in regard to the Executive Director, was present in the original legislation authorizing the appointment of that position. 1980 Md. Laws, Chap. 801. In regard to the License Hearing Officer, the relevant language was also present in the original enactment of the statute authorizing the appointment of that position. 1966 Md. Laws, Chap. 379.

sion. If, as the Commission contends, the Chairman is the "appointing authority," those statutory positions would then serve at the pleasure of both the Chairman (as the "appointing authority" under § 11–305) and the Commission (under the enabling provisions). Accepting the Commission's interpretation would create situations in which an individual employed in one of the special statutory positions would be subject to termination without the acquiescence or approval of the entity upon whose pleasure he or she serves. For example, were we to accept the Commission's contention that the Chairman is the "appointing authority," employees within the statutory positions would be subject to termination "solely in the discretion of [the Chairman]" under § 11–305, even though, under the statutes creating these positions, they each "serve[ ] at the pleasure of the Commission." If the full Commission is the "appointing authority," as used in § 11–305 (as referenced in PUC § 2–108(d)), there is no conflict and these interrelated statutes are harmonized.

### 4.

The Commission also urges us to place weight on the fact that the Chairman of the Commission has "always acted" [16] as the "appointing authority" for the Commission. The Commission cites situations in which past Chairmen exercised, in certain actions (including termination decisions), without apparent objection or challenge, power consistent with that of the "appointing authority." The Commission argues that its interpretation and implementation of this statutory scheme should be entitled to deference by reviewing courts. *See Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 69, 729 A.2d 376, 381 (1999) (stating that "an administrative agency's

---

**16.** Although the Commission cites examples of recent past Chairmen acting as the "appointing authority" during their tenures (dating back approximately ten years), the Commission presents no evidence that the Chairman's position has acted consistently as the "appointing authority" during the more than 90 year history of the Commission. Thus, on this record, there is no sufficiently longstanding, consistently followed administrative agency practice or interpretation that is entitled to deference in our analysis.

interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts"). Such deference, however, is ordinarily only shown to an agency's longstanding interpretation of a statute that it administers and that involves the special skills and expertise of that agency. *See id.* (emphasizing that this deference is only applicable when it involves the interpretation of a statute within the agency's specific area of expertise). The question of who or what is the "appointing authority" for a particular agency does not involve the special expertise of the Commission in utilities regulation, but rather is a State government personnel matter subject to the statutory interpretation principles that ultimately may become subject to interpretation by the courts of this State.

### 5.

Section 2–108(d)(7) of the PUC authorizes the Commission to "delegate to a commissioner or personnel the authority to perform an administrative function necessary to carry out a duty of the Commission." [17] As the Assistant Attorney General discussed in her 27 April 2004 advice letter [18]:

> The exception to the above stated rule [that a termination must be done by the "appointing authority"] would be if the Commission had delegated authority in this area to the Chairman. . . . It is not clear, however, whether the authori-

---

**17.** COMAR 17.04.01.04(A)(5), promulgated pursuant to Title 1 and § 4–106 of the State Personnel and Pensions Article, provides also that an "appointing authority," consistent with the State Personnel and Pensions Article, may "[d]elegate in writing the authority to act on the appointing authority's behalf to any other employee or officer under the appointing authority's jurisdiction."

**18.** Although we quote here from the advice letter of the Assistant Attorney General, we afford no enhanced weight to its conclusions and analysis. We have remarked in several instances that, although we may give some consideration to formal opinions of the Attorney General, we are not bound by them. *See, e.g., Drew v. First Guaranty Mortgage Corp.,* 379 Md. 318, 332, 842 A.2d 1, 9 (2003) (giving formal opinion letter due consideration, but disagreeing with its conclusion). In this case, however, we are confronted not with a formal opinion, but an informal advice letter.

**58**

ty to discipline or terminate the employees in question has been delegated to the Chairman. In conclusion, if such a delegation has been made, and is broad enough to cover the employees in question, then the firing by the Chairman is within his authority.

The record reveals no such delegation in the present case. To the contrary, a majority of the Commissioners sitting at the time of the initial termination of Wilson stated in an affidavit that they "have never delegated to Chairman Kenneth D. Schisler any authority to terminate the employment of the [terminated employees, including Wilson]." Furthermore, Chairman Schisler confirmed at his deposition that a majority of the sitting Commissioners did not vote to delegate to him the authority of "appointing authority."

Nonetheless, the Commission argues that, because the Chairperson has "always acted" as the "appointing authority" for the Commission, this "could be viewed as being indicative of the Commission's implicit delegation of authority to the Chairman." We find this argument overreaching on this record and, in any event, unavailing.[19] Even were we to accept the Commission's essentially unsupported allegation that the Chairman has "always acted" as the "appointing authority," we are not prepared to recognize the Commission's "implicit delegation" theory in light of the statutory analysis discussed in this opinion. That a Chairman may not have been challenged in his or her actions in this capacity in the past should not be transmuted into an ongoing delegation in

---

19. The Commission argues also that, even if we do not accept its interpretation of "appointing authority," we should accord deference to the acquiescence of the State Department of Budget and Management ("DBM") in the Commission's interpretation. The Commission cites instances in which past Chairmen filed with the DBM, without objection, formal delegations of the "appointing authority" without the approval, acquiescence, or delegation of the full Commission. *See* COMAR 17.04.01.04(D) (stating that the "appointing authority" must "notify the Secretary [of the Department of Budget and Management] of any delegation of authority by providing the Secretary a copy of the delegation"). Any weight accorded this passive acquiescence is negligible compared to the level of deference we traditionally give to the active interpretation of regulations in an adversarial environment.

direct contravention of the statutory scheme. Moreover, even if past Chairmen exercised authority in the capacity of "appointing authority" with regard to past terminations, the Commission did not allege any facts, admissible in evidence, that the Commission acquiesced in the actions of the Chairman in affecting the initial termination of Wilson. Rather, a majority of the Commissioners sitting at the time of Wilson's initial termination disavowed expressly any delegation of authority or approval of Chairman Schisler's action. That alone rebuts any argued-for inference of an ongoing implicit delegation of authority.

## IV.

Having determined that the 15 April 2004 termination of Wilson was unlawful because it was not effectuated by at least a majority of the Commissioners sitting at the time or by proper delegation of the Commission's "appointing authority" powers to the Chairman, we consider next whether the 29 October 2004 re-termination of Wilson was unlawful or unconstitutional. Although the re-termination was taken by a majority of the Commissioners then sitting, Wilson argues it was unlawful nonetheless because she was not afforded the pre-termination statutory protections due an employee terminated "for cause." Wilson also contends that, if she were deemed terminated purely as an "at-will" employee (for which no cause need be offered), the statutory post-termination administrative appeal process, as applied to her situation was unconstitutional because it provided that her appeal be heard by Chairman Schisler, as the "head of the principal unit," who she contends was incapable of providing an impartial agency review.

## A.

■ Although the Circuit Court's 25 October order did not conclude whether Wilson was fired "for cause," the 15 November order amended the prior findings, determining that not only was the original 15 April termination "for cause" as a result of "alleged misconduct," but that the 29 October re-

termination was "tainted by the initial unlawful termination." [20] For reasons we shall explain, we conclude that, on the undisputed material facts revealed by the record, the Circuit Court erred as a matter of law in resolving that the 15 April termination, and impliedly the 29 October re-termination, were *sub silentio* the result of "employee misconduct." Therefore, the re-termination by the Commission did not require it to afford Wilson the statutory pre-termination protections of § 11–106.

### 1.

As stated *supra*, Wilson's employment position with the PSC was in the management service, a classification that, among other things, provided that she was an at-will employee

---

**20.** Although a determination as to whether Wilson was terminated "for cause" did not appear in the 25 October order, the trial judge, at the 20 October 2004 hearing, commented on this issue:

> It seems to me that the Commission is, is caught in a bind. They either—this was an at-will termination by the Chair, or it was a termination for one of the reasons set forth in Mr. Schisler's, the Chair's deposition, that it be for cause. If it was for cause, they've got to follow the usual steps that are required for an at cause [sic] for termination.
>
> But I'm going to give the benefit of a doubt in this case, and that he was terminating an at-will employee when he was not delegated the authority by the Commission....

From this language (and the absence of a determination to the contrary in the 25 October order), it appears that the trial judge concluded that the termination was not deficient for failure to follow the statutory mandate of § 11–106 because it was not a termination based on "employee misconduct" (or, in the trial judge's terminology, "for cause").

During the 10 November hearing, the trial judge, although declining to hold the Commission in contempt, remarked:

> ... I don't want to hold the Commission in contempt though their action probably was contemptuous.... All I want them to do—and I don't think they cured the situation *because I found that she was terminated for cause*—they have to go through the process of a hearing on whether they had cause to terminate her. Go through the process—the whole process they have for with cause termination. (Emphasis added).

The emphasized language from the 10 November hearing transcript suggests that the trial judge mis-recollected his earlier view or, at best, changed his mind.

who served at the pleasure of the "appointing authority." § 11–305.[21] Nonetheless, she claims that her termination was unlawful because it was based on Chairman Schisler's consideration, in reaching the initial termination decision, of alleged misconduct on her part. Under § 11–106, the "appointing authority" is restricted in its ability to take any disciplinary action, including termination, when that action is based on "employee misconduct." *See Danaher v. Dep't of Labor, Licensing & Regulation,* 148 Md.App. 139, 166, 811 A.2d 359, 375 (2002) (holding that § 11–106 applies to at-will employees in the management service where misconduct is the ground for disciplinary action).

In support of her contention that she was terminated for the reason of "employee misconduct," Wilson cites several passages from the transcript of Chairman Schisler's deposition, in which he expressed his thoughts on certain performance issues and other factors that, according to Wilson, were the foundation for the Chairman's decision to terminate her. For purposes of clarity, we set forth generally the following allusions and assessments (referred to earlier and subsequently in this opinion as the "performance issues") mentioned by Chairman Schisler during his deposition:

1. Wilson possessed poor letter-drafting skills;

2. Wilson's writing style was sub-par;

---

**21.** In the typical at-will employment situation that finds its way into litigation, we have explained:

> In the at-will employment context, we have held that a jury may not review any aspect of the employer's decision to terminate and that the employer may, absent a contravening public policy, terminate an employer [sic] for any reason, even a reason that is arbitrary, capricious, or fundamentally unfair. For our purposes, the significant point is that courts and juries may not review either the employer's (1) motivation or (2) factual bases for termination in the context of an at-will employment relationship.

> *Towson Univ. v. Conte,* 384 Md. 68, 82–83, 862 A.2d 941, 949 (2004) (citations omitted). In the present case, however, the application of these principles is affected by the fact that termination of Wilson's governmental at-will employment is governed by additional statutory and regulatory considerations.

3. Wilson was unresponsive to utility consumers in her letters;

4. Wilson was "in the office very little by [Chairman Schisler's] standards in terms of her duties as Manager of External Relations, . . . away from the desk, away from the supervision responsibility quite a bit";

5. Wilson spent an inappropriate amount of time socializing in the hallways, creating a "disruptive" environment;

6. Wilson had "a great deal of difficulty accepting any personal responsibility for things that weren't working well";

7. Wilson "lacked a fundamental understanding of the dispute resolution process" designed to resolve disputes between consumers and utility providers;

8. Wilson lacked a proper understanding of the legal requirements of her position, and thus could not be relied upon to train her employees;

9. Wilson was unresponsive to Chairman Schisler's attempts to motivate her to achieve a higher level of job performance; and

10. Wilson did not possess sound decision-making skills.

In addition to these generalizations, Chairman Schisler alluded during his deposition to a particular incident when he suspected Wilson intentionally may have submitted an inaccurate time sheet (the "time sheet incident"). The Chairman explained that, "[c]onsistent with [Wilson] being away from the office quite a bit, I began to keep closer tabs on her around the holidays of 2003, . . . just to kind of be able to point out to her when I expected her to be with her [subordinates]." On one particular occasion when he was away from the office and wished to contact Wilson, he asked another employee to go to Wilson's office and ask her to get in touch with him. The employee informed Chairman Schisler that, although he had gone to Wilson's office at least twice during the course of the day in question, he was unable to locate Wilson. The Chairman stated that, when Wilson turned in her time sheet for the period including the date in question, he

noticed that Wilson indicated that she worked that day. He claimed to have confronted Wilson within a few days thereafter and questioned her as to whether she in fact was at work on the day in question or had made a mistake with respect to the time sheet. Wilson, according to the Chairman, became "very defensive" and denied any misrepresentation. Although the Chairman found the circumstances of this incident "troubling," he stated that he signed Wilson's time sheet and took no further action with regard to the incident.

2.

Although Chairman Schisler acknowledged that he informed Wilson of his various concerns at various times, he was adamant during his deposition that his decision to terminate Wilson was not based on either the performance issues or the time sheet incident. On no less than 15 instances during the deposition, he stated that the performance issues played no role in his decision to terminate Wilson. He also took some pain not to characterize Wilson's termination as a "for cause" termination. Instead, Chairman Schisler pointed to Wilson's status as an at-will employee, emphasizing that no reason was necessary to be given for her termination and, in the 15 April written notice, none was given. When prodded by Wilson's counsel, he indicated, on several other occasions during the deposition, that the termination of Wilson was necessary in light of his stated, but somewhat vague, desire to build a more cohesive and productive management team at the PSC.

Although Chairman Schisler, at several points during the deposition, denied that he factored the performance issues and time sheet incident into his termination decision, Wilson points to other parts of the deposition in which, Wilson argues, he admitted otherwise.[22] During his ruminations on the perform-

---

22. If the Chairman's deposition were read to contain contradictory positions whether he relied on the performance issues as cause for termination as Wilson maintains, that would generate the need for resolution of a material factual dispute by the trier of fact, based on a credibility assessment to some extent, and foreclose the grant of sum-

ance issues, the Chairman stated that these concerns "were issues that I couldn't ignore" and that could not be "separate[d]" from the termination decision. Finally, Wilson relies on the following passages, all of which occurred in the deposition subsequent to Chairman Schisler's discussion of the performance issues and the time sheet incident, in support of her contention that she was terminated for "employee misconduct":

Q [Counsel for Wilson]: What did you take into account in deciding to terminate Ms. Wilson?

A [Chairman Schisler]: I took into account all of the factors that were with respect to her performance and also the overall needs of the agency. Okay? But without respect to any particular personnel deficiency that I may have articulated, those weren't causes that were involved in the separation, but I clearly evaluated the entire landscape of what the needs of the agency were.

\* \* \*

Q: Well let me ask you this. If Ms. Wilson had not had any of the personnel problems that we discussed and was doing a fantastic job in your view across the board, would she have been terminated?

A: I think the sort of the common sense answer to that is no. But if you're asking in a legal sort of frame work, the answer would be yes because she was not fired for cause.

But, I mean, if you think someone is a superb employee, irreplaceable, you generally don't make personnel changes there. But it was not a factor in the personnel decision.

\* \* \*

Q: And in your mind part of the reason for [the termination of Wilson] was the performance issues we've talked about. Fair?

mary judgment. Md. Rule 2–501; *see also Pittman v. Atlantic Realty Co.*, 359 Md. 513, 536–38, 754 A.2d 1030, 1042–44 (2000).

A: I would say the performance issues were—I mean, I'm human. I wouldn't separate that. But I didn't do the analysis with respect to a cause for termination.

I was concerned about—was I concerned about the management of the External Relations Office? Yes. Was I concerned about Ms. Wilson's time on the job and ability to ensure others were working full days and so forth and not taking excessive breaks and those sorts of the things? Yes. Was I concerned about the quality of her writing, the quality of the decision making, all those things? Yes. Were they part of an environment, an atmosphere that caused me to spend more time on External Relations? Yes. Did I, therefore, then make the leap that I'm going to see if this is cause to terminate on a cause basis, the answer is unequivocally no. So I didn't—because I recognize that Ms. Wilson was an at-will employee and didn't need to supply cause reasons.

## B.

Although § 11–106 outlines the procedures that the "appointing authority" must follow before imposing a disciplinary sanction based on "employee misconduct," the term "employee misconduct" is not defined in that section, nor is it defined elsewhere in the State Personnel and Pensions Article. In order to determine whether Wilson was entitled to the statutory protections in § 11–106, we must determine what types of conduct fall within the phrase "employee misconduct" before deciding whether, on the state of the record in this case where summary judgment was granted, Wilson was terminated *sub silentio* as the result of "employee misconduct."

### 1.

In order to gain some perspective on the current State system governing employee discipline and terminations, it is necessary to understand something of its immediate predecessor statutory and regulatory scheme. Prior to 1996, the State Employee Management System, codified in the 1993 edition of the State Personnel and Pensions Article, established two

classes of State employees: classified service and unclassified service. § 1–101(d) (1993); § 1–101(o) (1993). The statutory scheme provided that, unless excluded by statute, all positions in the Executive branch of State government and certain clerical and administrative positions within the Judicial branch, among others, were in the classified service.[23] § 1–301 (1993); § 1–302 (1993). In general, a position to which a person was appointed or a position requiring special training or qualifications was in the unclassified service. § 1–401 (1993); § 1–403 (1993). An important distinction between the two classifications was the process afforded an employee prior to termination.

Unclassified employees, like the current management service, were at-will employees under the prior statutory scheme. *See* Revisor's Note, § 9–101 (1993) (stating that "[u]nclassified service employees serve at the pleasure of the appointing authority . . ."). Classified employees, however, could be removed by the "appointing authority" only "for cause." § 9–202 (1993). The Department of Personnel, pursuant to § 9–203 (1993), adopted regulations (since superceded) to prescribe what conduct constituted "for cause." COMAR 06.01.01.47 (1996) stated:

> The following shall be sufficient cause of removal, though removal may be for causes other than those enumerated:
>
> A. That the employee is incompetent or inefficient in the performance of his duty;
>
> B. That the employee has been wantonly careless or negligent in the performance of his duty or has used unwarrantable or excessive force in his treatment of public charges, fellow employees, or other persons;
>
> C. That the employee has some permanent or chronic physical or mental ailment or defect that incapacitates him for the proper performance of his duties;

---

23. All positions in the Legislative branch of State government, under both current and prior statutory schemes, are excluded from the State Personnel Management System. § 6–304; § 1–205 (1993).

D. That the employee has violated any lawful regulation or order or failed to obey any lawful and reasonable direction given by his superior officer when the violation or failure to obey amounts to insubordination or serious breach of discipline which may reasonably be expected to result in a lower morale in the organization or to result in loss or injury to the State or the public;

E. That the employee has been wantonly offensive in his conduct toward fellow employees, wards of the State, or the public;

F. That the employee has taken for personal use, a fee, gift, or other valuable thing in the course of his work or in connection with it when the fee, gift, or other valuable thing is given him by any person in the hope or expectation of receiving a favor or better treatment than that accorded other persons;

G. That the employee is engaged in a private business or in a trade or occupation when the duties of his position as prescribed by law or regulation require his entire time for their performance;

H. That the employee has been guilty of a violation or violations of State Personnel and Pensions Article, Title 13, Subtitle 1 [Miscellaneous prohibited acts];

I. That the employee has been convicted of a criminal offense or of a misdemeanor involving moral turpitude;

J. That the employee, through negligence or willful conduct, has caused damage to public property or waste of public supplies;

K. That the employee has been guilty of a violation or violations of the provisions of ... the Corrupt Practices Act, or using, threatening to use, or attempting to use political influence or the influence of any State employee or officer in securing promotion, transfer, leave of absence, or increased pay;

L. That the employee has willfully made a false official statement or report;

M. That the employee has been guilty of conduct such as to bring the classified service into public disrepute;

N. That the Secretary has investigated the employee's qualifications and background and has discovered that fraudulent or irregular information resulted in the employee's appointment. . . .

In 1996, the Legislature enacted the State Personnel Management System Reform Act, which effected a comprehensive restructuring of the State Personnel Management System. 1996 Md. Laws, Chap. 347. One of the primary changes made to the system was the elimination of the categories of classified/unclassified services. In their place, the Legislature created six categories: skilled service, § 6–401, professional service, § 6–402, management service, § 6–403, executive service, § 6–404, special appointees, § 6–405, and temporary employees, § 6–406. 1996 Md. Laws, Chap. 347. As with the former classified and unclassified service employees though, a significant distinction between the different services remained as to the level of protection and process afforded an employee prior to termination or other disciplinary actions for misconduct. Although employees that are special appointees or in the management and executive services are classified explicitly as at-will employees that serve at the pleasure of the "appointing authority," § 11–305, skilled and professional service employees are granted certain statutory protections regarding their continued employment.[24]

Title 11, Subtitle 1 of the State Personnel and Pensions Article contains a comprehensive administrative appeal process for disciplinary actions applicable solely to employees in the professional and skilled services. Section 11–109(c)(1) provides, as a first level of appeal, that:

---

24. Executive service employees and "special appointees" generally are governed by the same statutory provisions and protections as management service employees. *See, e.g.,* § 11–305; § 11–113. Because the application of the relevant statutes to these classifications generally are irrelevant to the resolution of this case, we shall omit references henceforth in this opinion to these classifications.

An employee or an employee's representative may file with the head of the principal unit a written appeal of a disciplinary action that states, to the extent possible, the issues of fact and law that the employee believes would warrant rescinding the disciplinary action.[25]

An employee in the professional or skilled services may appeal such a decision under § 11–109, within 10 days of receiving the decision, to the Secretary of Budget and Management. § 11–110. Under § 11–110, the Secretary, within 30 days, either must mediate a settlement between the employee and employer or refer the appeal to the Maryland Office of Administrative Hearings ("OAH"), the State's centralized panel of neutral administrative law judges. § 11–110(b). If the matter is referred to the OAH, the OAH must hold a hearing on the matter. The hearing is governed by the procedures in the State Administrative Procedure Act ("APA").[26] § 11–110(c)(2). The decision of the OAH is the final agency decision in such matters. § 11–110(d)(3).

Aside from these post-disciplinary action procedures, the current statutory scheme provides for other protections or processes that must occur *before* certain disciplinary actions are taken. Section 11–106 provides that the "appointing authority" is restricted in its ability to take any disciplinary action, including termination, when that action is based on "employee misconduct." Although this section does not state explicitly to which classifications of employees it applies, § 11–102 states explicitly that Subtitle 11 applies to all, save temporary, employees. For purposes of our analysis then, we shall assume that § 11–106 applies to employees in the management service. *See Danaher v. Dep't of Labor, Licensing & Regulation*, 148 Md.App. 139, 166, 811 A.2d 359, 375 (2002)

---

**25.** In contrast, an appeal by a member of the management service "may only be based on the grounds that the disciplinary action is illegal or unconstitutional." § 11–113; § 11–305.

**26.** How § 10–203(a)(3)(vi) of the State Government Article of the Maryland Code (exempting the PSC from the contested case subtitle of the APA) affects, if at all, the directives of § 11–110 of the State Personnel and Pensions Article is not before us in this case.

(holding that § 11–106 applies to at-will employees in the management service). Section 11–106, in its entirety, states:

**§ 11–106. Duty of appointing authority prior to imposing sanctions.**

(a) *Procedure.*—Before taking any disciplinary action related to employee misconduct, an appointing authority shall:

(1) investigate the alleged misconduct;

(2) meet with the employee;

(3) consider any mitigating circumstances;

(4) determine the appropriate disciplinary action, if any, to be imposed; and

(5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights.

(b) *Time limit.*—Except as provided in subsection (c) of this section, an appointing authority may impose any disciplinary action no later than 30 days after the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed.

(c) *Suspension.*—(1) An appointing authority may suspend an employee without pay no later than 5 workdays following the close of the employee's next shift after the appointing authority acquires knowledge of the misconduct for which the suspension is imposed.

(2) Saturdays, Sundays, legal holidays, and employee leave days are excluded in calculating the 5–workday period under this subsection.

2.

Wilson claims that, because she was terminated as a result of "employee misconduct," [27] her termination was illegal be-

---

**27.** Throughout Wilson's argument and the language of the Circuit Court's orders, the term "for cause" is used to describe why Wilson was terminated. We note, however, that nowhere in the termination notices she received or in the current State Personnel and Pensions Article is the term "for cause" used or defined. This is not a distinction without a difference. It appears that, in utilizing the term "for cause," the Circuit Court experienced some confusion in applying the doctrine of

cause the "appointing authority" did not follow the pre-termination procedures outlined in § 11–106. Even were we to assume, for the sake of argument, that Chairman Schisler terminated Wilson for the reasons she assigns, the question remains whether any of the "factual" bases urged rose to the level of "employee misconduct," as contemplated by § 11–106.

▬▬ In *Smack v. Department of Health and Mental Hygiene*, 134 Md.App. 412, 759 A.2d 1209 (2000), *aff'd*, 378 Md. 298, 835 A.2d 1175 (2003), the Court of Special Appeals held that § 11–106 did not apply to probationary employees in the State Personnel Management System. In reaching that conclusion, the intermediate appellate court observed:

> At oral argument, appellant [employee] asserted that, even if a probationary employee's employment could be terminated at the discretion of the employer, nevertheless, § 11–106 would be applicable in this case because [the employer] in fact treated this as a misconduct case. We disagree.

at-will employment as it relates to State management service employees. By categorizing Wilson's termination as "for cause," rather than as the result of "employee misconduct," the Circuit Court blurred the line between management service employees and employees within the skilled and professional services, the latter having been determined by the Legislature to be deserving of greater statutory protections than at-will employees. For example, when counsel for Chairman Schisler suggested, during the 10 November 2004 Circuit Court hearing, that the Circuit Court's "Order alters Ms. Wilson's status from an at will employee to an employee who can only be fired for cause," the Circuit Court responded:

> No. It didn't alter her status. I said even an at will employee who is fired for cause—you have to go—you have to have a hearing and go through the process of terminating her. She remains an at will employee—if you don't say anything, and you just smile and say you're gone, that's fine, but when you go to the legislature, and you go to other people and say she was inefficient, she did this, she did that, she spent time out in the halls and talking to other employees. You know, whatever you want—all the reasons that you give for terminating, that is a for cause termination. It is not an at will termination.

We note also that the Circuit Court erred in failing to recognize a distinction between "employee performance" and "employee misconduct," discussed *infra*.

[Section § 11–106] does not define misconduct, but it is clearly a concept distinct from lack of proficiency in employment, although the two could overlap.

*Id.* at 419, 759 A.2d at 1213. Although the Court of Special Appeals ultimately determined that it was "immaterial" whether the conduct in question could be classified as "misconduct," we agree generally with the intermediate court's analysis that there is a clear distinction between "employee performance" and "employee misconduct." *Id.* In support of this view, we look to the regulations promulgated pursuant to Title 11 of the State Personnel and Pensions Article.

COMAR 17.04.05, entitled "Disciplinary Actions," covers generally disciplinary actions taken against all employees, no matter in what service classification they may be categorized. Regulations within this chapter make a sharp distinction between disciplinary actions related to "employee performance," and disciplinary actions related to "employee misconduct." *See* 17.04.05.01(A) (stating that disciplinary actions may be taken both as a result of "[u]nsatisfactory performance of duties and responsibilities" and "[m]isconduct").

COMAR 17.04.05 recognizes a distinction between the discipline of management service employees on one hand, and the discipline of professional and skilled service employees on the other. COMAR 17.04.05.01(H), for example, states that "[a] disciplinary action against an employee under special appointment or in the management and executive services is governed by Regulations .05 and .06 of this chapter." Those two regulations, in essence, reiterate the at-will nature of management service employees and the relatively restricted, post-termination administrative appeal process available to those employees.

COMAR 17.04.05.03 and 17.04.05.04, on the other hand, apply only to disciplinary actions taken against employees in the skilled or professional services. COMAR 17.04.05.03, in relevant part, states:

**.03 Disciplinary Actions Related to Employee Performance.**

B. The appointing authority may discipline an employee for reasons related to the employee's performance. These reasons include but are not limited to:

(1) That the employee is incompetent or inefficient in the performance of the employee's duty;

(2) That the employee is an individual with a disability who with a reasonable accommodation cannot perform the essential functions of the position; or

(3) That the employee currently is not qualified for the position.

COMAR 17.04.05.04, in relevant part, states:

**.04 Disciplinary Actions Relating to Employee Misconduct.**

B. An employee may be disciplined for engaging in any of the following actions:

(1) Being negligent in the performance of duties;

(2) Engaging in intentional misconduct, without justification, which injures another person, causes damage to property, or threatens the safety of the work place;

(3) Being guilty of conduct that has brought or, if publicized, would bring the State into disrepute;

(4) Being unjustifiably offensive in the employee's conduct toward fellow employees, wards of the State, or the public;

(5) Violating a provision of the State Personnel and Pensions Article, Title 2, Subtitle 3; Title 15; or § 9–607; Annotated Code of Maryland;

(6) Stealing State property with a value of $300 or less;

(7) After notification, continuing to engage in another business, trade, or occupation, which conflicts with the employee's position, or which prevents the employee from satisfactorily performing the duties of the employee's position;

(8) Engaging in conduct involving dishonesty, fraud, deceit, misrepresentation, or illegality;

(9) Causing damage to public property or wasting public supplies through negligence, recklessness, or willful conduct;

(10) Willfully making a false official statement or report;

(11) Knowingly assisting another in conduct that is a violation of State Personnel and Pensions Article, Annotated Code of Maryland, the regulations in this chapter, or any other lawful agency policy;

(12) Violating a lawful order or failing to obey a lawful order given by a superior, or engaging in conduct, violating a lawful order, or failing to obey a lawful order which amounts to subordination;

(13) Engaging in discrimination prohibited by law;

(14) Using leave contrary to law or policy; or

(15) Committing another act, not previously specified, when there is a connection between the employee's activities and an identifiable detriment to the State.

Although these two regulations, forming part of the related regulatory scheme implementing the State Personnel and Pensions Article, apply expressly only to those employees in the skilled and professional services and, thus, not to Wilson's position at issue in the present case, we conclude that they provide a proper perspective on the distinction between performance deficiencies and "employee misconduct."[28] For example, COMAR 17.04.05.03(B) states explicitly that not being qualified or being incompetent or inefficient is a deficiency in *performance*, rather than misconduct. Each of these examples of a deficiency in performance denotes an inability to perform satisfactorily one's duties, rather than an intentional or negligent failure to fulfill one's duties.

The regulations relating to "employee misconduct," on the other hand, do not implicate necessarily an employee's abilities

---

**28.** The examples of "employee misconduct" and "employee performance," together with the grounds for automatic termination identified in § 11–105, appear to constitute the entire scope of COMAR 06.01.01.47 (1996), which contained the definition of "for cause" under the prior State Personnel Management System.

or qualifications to perform in a position. Instead, each of the enumerated examples of "misconduct" involves either negligence, willful disregard of one's duties, failure to comply with employer regulations, knowingly violating a statute, or the commission of a criminal act. There is an element of wrongdoing or culpable negligence that is woven throughout the examples of "misconduct," a trait not shared with the examples of performance deficiencies. *See* Black's Law Dictionary 1019 (8th ed.2004) (defining "misconduct" generally as "[a] dereliction of duty; unlawful or improper behavior"). Although, as stated above, these regulations do not apply directly to Wilson's former position, they guide us in concluding that the performance issues mentioned by Chairman Schisler in his deposition would not qualify, as a matter of law, as "employee misconduct," even if they formed the bases for Wilson's termination, and therefore do not implicate the protections of § 11–106.

### 3.

We find further support for this characterization and analysis of "employee misconduct" through examination of another Maryland statutory scheme and its related case law in which the scope of employment "misconduct" has been scrutinized. Title 8 of the Labor and Employment Article, entitled "Unemployment Insurance," establishes a program in which cash benefits are paid to individuals who become unemployed involuntarily, in order to "lighten [the] burden" of the economic instability attributed to prolonged unemployment. Md.Code (1991, 1999 Repl.Vol.), § 8–102 of the Labor and Employment Article ("LE"). This statutory scheme also provides that an otherwise eligible individual may be disqualified from receiving all or a portion of these unemployment benefits under varying enumerated circumstances. In addition to being disqualified as the result of a voluntary resignation (without good cause), an individual may be disqualified from receiving unemployment benefits if "the Secretary [of the Department of Labor, Licensing, and Regulation] finds that unemployment results from discharge or suspension as a disciplinary measure

for behavior that the Secretary finds is *misconduct* in connection with employment...." LE § 8–1003 (emphasis added).

Section 8–1003 of the LE Article is part of a graduated disqualification scheme in which escalating periods of disqualification are imposed depending on the severity of the claimant's misconduct. Sections 8–1002 and 8–1002.1 of the LE Article, covering terminations involving "gross misconduct" and "aggravated misconduct," respectively, allow for significantly longer lengths of disqualification than would a finding of simple "misconduct" under § 8–1003. Although "misconduct," as used in § 8–1003, is not defined in the statutory scheme,[29] several Maryland cases have interpreted and defined the term in this statutory context. *See Dep't of Labor, Licensing & Regulation v. Hider,* 349 Md. 71, 84, 706 A.2d 1073, 1079 (1998) (holding that, in order to constitute "misconduct," a person's wrongful conduct need not be intentional); *Allen v. Core Target City Youth Program,* 275 Md. 69, 87, 338

---

**29.** Despite failing to define "misconduct," the Labor and Employment Article does contain definitions for "aggravated misconduct" and "gross misconduct." "Gross misconduct" is defined as

 (1) ... conduct of an employee that is:
 (i) deliberate and willful disregard of standards of behavior that an employing unit rightfully expects and that shows gross indifference to the interests of the employing unit; or
 (ii) repeated violations of employment rules that prove a regular and wanton disregard of the employee's obligations; and
 (2) does not include:
 (i) aggravated misconduct [as defined by § 8–1002.1]; or
 (ii) other misconduct [as referenced in § 8–1003].
LE § 8–1002.
"Aggravated misconduct," on the other hand, is defined as:
 (1) ... behavior committed with actual malice and deliberate disregard for the property, safety, or life of others that:
 (i) affects the employer, fellow employees, subcontractors, invitees of the employer, members of the public, or the ultimate consumer of the employer's product or services; and
 (ii) consists of either physical assault or property loss or damage so serious that the penalties of misconduct or gross misconduct are not sufficient.
 (2) In this section, "aggravated misconduct" does not include:
 (i) gross misconduct [as defined by § 8–1002]; or
 (ii) misconduct [as referenced in § 8–1003].
LE § 8–1002.1.

A.2d 237, 247–48 (1975) (commenting on the distinction between "leaving work voluntarily" and termination for "misconduct"); *Johns Hopkins Univ. v. Bd. of Labor, Licensing, & Regulations,* 134 Md.App. 653, 662–63, 761 A.2d 350, 354–55 (2000) (affirming the lack of an intent requirement to find that conduct resulting from bipolar disorder was nonetheless disqualifying "misconduct").

In *Hider,* we rejected the Court of Special Appeals's conclusion that, in order to constitute "misconduct" under § 8–1003, "an employee's misbehavior must be intentional." 349 Md. at 84, 706 A.2d at 1079. Relying on the three-tiered system of disqualification provided for in the statute, the Court reasoned that applying an intent requirement to mere "misconduct" under § 8–1003 would blur the distinctions between ordinary "misconduct" and "gross" or "aggravated" misconduct. *Id.* at 82–84, 706 A.2d at 1078–79. In rejecting an intent requirement, we adopted the following definition of "misconduct":

> The term, "misconduct," . . . means a transgression of some established rule or policy of the employer, the commission of a forbidden act, a dereliction of duty, or a course of wrongful conduct committed by an employee, within the scope of his employment relationship, during hours of employment, or on the employer's premises.

*Id.* at 85, 706 A.2d at 1079 (quoting *Rogers v. Radio Shack,* 271 Md. 126, 132, 314 A.2d 113, 117 (1974)).

We note that, in most unemployment benefit disqualification situations discussed in the reported cases, there is present naturally a concerted attempt on the part of the employee to demonstrate that his or her behavior was not "misconduct" under all or some of the statutory definitions. *See, e.g., Hider,* 349 Md. at 73–74, 706 A.2d at 1074–75. In the present case, however, the employee, Wilson, urges that a court conclude that she was terminated as the result of "employee misconduct." Nonetheless, we resolve that the definition of "misconduct" established in *Hider* provides a suitable and proper standard to be applied when determining whether conduct rises to the level of "employee misconduct"

requiring the application of the pre-termination protections of § 11–106 prior to discharge.

4.

Applying this definition to the present case, we conclude that the performance issues identified by Chairman Schisler during his deposition, even assuming they formed all or some of the bases for his termination of Wilson, do not rise, as a matter of law, to the level of a discharge for "employee misconduct." *See, e.g., Ramsey v. Mississippi Employment Sec. Comm'n,* —— So.2d ——, at ——, 2005 WL 1530431, at *2 (Miss.Ct.App.2005) (stating that "[m]ere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, or inadvertence and ordinary negligence in isolated incidents, and good faith errors in judgment or discretion were not considered 'misconduct' within the meaning of the [Mississippi unemployment benefits statute]"). Each of the performance issues mentioned by the Chairman involved, at worst and if true, a deficiency in judgment, skill, ability, or competence, rather than "the commission of a forbidden act, a dereliction of duty, or a course of wrongful conduct." There is no evidentiary basis in this record from which a trier of fact could conclude that Wilson's alleged performance shortcomings constituted a breach or "transgression of some established rule or policy of the employer."

 Nor could any of the performance issues constitute a "dereliction of duty." Black's Law Dictionary defines "dereliction" as "[a]bandonment, esp[ecially] through neglect or moral wrong." Black's Law Dictionary 475 (8th ed.2004). Similarly, Black's defines "derelict" as "[l]acking a sense of duty; in breach of a legal or moral obligation <*the managers were derelict in their duties* >" *Id.* (emphasis added). The common understanding of the term "dereliction of duty," along with those of "forbidden act" and "course of wrongful conduct," endorse our conclusion that, in order to rise to the level of "employee misconduct," the alleged conduct would need to involve some element of wrongdoing, culpable negligence, or breach of a legal or moral obligation. Although Wilson's

perceived performance deficiencies, in Chairman Schisler's opinion, may have been disruptive to the operation of the PSC as he conceived it should take place, such conduct did not involve any element of wrongdoing or culpable negligence. The mere incompetency or inefficiency of an employee, without an element of wrongdoing, does not constitute misconduct. We hold that, when an employee in the management service, in the opinion of the "appointing authority," simply does not possess the skills, abilities, or judgment necessary to fulfill satisfactorily his or her duties, those deficiencies ordinarily do not rise to the level of a finding of "employee misconduct" and therefore a termination, if based expressly or implicitly on such deficiencies or related conduct, would not implicate § 11–106. We conclude that the performance issues elicited from Chairman Schisler in his deposition do not amount to "employee misconduct" and, thus, a termination based on those alleged shortcomings, even assuming that is what occurred here, does not implicate § 11–106.

### C.

Wilson additionally contends that she was terminated as a result of her alleged fraudulent completion and submission of a time sheet. In our view, however, although such conduct, if assumed to be true, would constitute "employee misconduct" as that term is used in § 11–106, the statute is inapplicable to the present case because Wilson failed to generate a triable issue whether Chairman Schisler relied on the time sheet incident as a basis for his decision to terminate her.

### 1.

As summarized *supra,* Chairman Schisler, during his deposition, detailed an interaction with Wilson in which, it fairly may be deemed, he impliedly accused her of intentionally submitting a false time sheet. Applying the definition of "misconduct" adopted earlier in this opinion, such conduct, had it been offered as the basis for the termination, clearly would constitute an allegation of "employee misconduct." The prem-

ise behind a fraudulent time sheet indicating more time worked than in actuality was performed is obviously that the employee, although required or believed to be present at the workplace and engaged in the employer's work, in essence abandoned his or her position to a level tantamount to a "dereliction of duty." Furthermore, such conduct would be a "forbidden act." COMAR 17.04.05.04, which outlines "employee misconduct," includes within that concept the act of "[e]ngaging in conduct involving dishonesty, fraud, deceit, misrepresentation, or illegality." A permissible inference that may be drawn from what Chairman Schisler stated at his deposition is that, at some time around the end of the 2003 holiday season, he thought that, in submitting her time sheet, Wilson may have been dishonest and misrepresented the actual amount of time that she worked. A fraudulent entry on a submitted time sheet certainly would qualify, under the examples found in this regulation, as "employee misconduct."

## 2.

Chairman Schisler, however, claimed that, although he concluded his investigation of the time sheet incident feeling "troubl[ed]" about Wilson's culpability and credibility, he did not factor this "misconduct" into his decision to terminate her. Wilson claims that, in his deposition, the Chairman admitted that the time sheet incident played a role in the termination decision.

The Commission retorts that, even if Chairman Schisler considered the time sheet incident in reaching his termination decision, the pre-termination statutory protections of § 11–106 should not apply because it was not a reason expressly given for termination in the written notice (indeed, the only notice) to Wilson. The Commission asks us to subscribe to a bright-line rule in which the process guaranteed in § 11–106 is required only when "employee misconduct" is the only, or perhaps the primary, express reason given for the imposition

of discipline.[30] We decline the Commission's invitation and instead adhere to the plain statutory language of § 11–106.

We begin our analysis with an examination of the role that § 11–106, as applied to management service employees, plays in the statutory scheme regarding discipline in general and terminations specifically. As noted *supra*, before an employee is disciplined for "employee misconduct," the "appointing authority," no matter in which classification or service the employee resides, must follow the statutory process outlined in § 11–106. Whether the "appointing authority" must follow similar procedures when imposing disciplinary sanctions as the result of "employee performance," however, depends on the classification or service of the employee in question.

COMAR 17.04.05.03(C) states that, before an employee in the skilled or professional services may be disciplined for performance-related reasons, the "appointing authority" must comply with investigatory and notice provisions similar to those mandated by § 11–106. There are no similar pre-

---

**30.** The Commission's proposed rule, at first blush, appears to be a practical interpretation and application of the framework of § 11–106 in the context of State government at-will employees. We note that, in each of the reported cases in which § 11–106 has been examined or discussed in substance, the facts demonstrated that the terminated or disciplined employee was informed explicitly, usually in a formal termination letter, of the "employee misconduct" for which he or she was being terminated. *See, e.g., Danaher,* 148 Md.App. at 150, 811 A.2d at 366 (stating in a letter that the employee was terminated as a result of misconduct). Furthermore, the vast majority of these cases involved situations in which not only were the factual predicates for the misconduct communicated, but also the particular statutes, regulations, or guidelines that were breached by the terminated or disciplined employee. *See, e.g., W. Corr. Inst. v. Geiger,* 371 Md. 125, 131–35, 807 A.2d 32, 36–38 (2002) (stating in a notice of termination the department standards and regulation that the terminated employee had violated). Complications arise in cases such as this, where the "appointing authority" is terse in the relevant communications with the employee. In this case, Wilson was not informed verbally or in writing that her termination was the result of "employee misconduct," nor of the factual predicate for any alleged misconduct that she now sees as the inspiration for her termination. Of course, the terse termination notices in the present case are entirely consistent with the Commission's official position that Wilson was terminated for no particular reason because, as an at-will employee, no reason need be given.

disciplinary provisions, in either the State Personnel and Pensions Article or the regulations promulgated pursuant to that Article, governing performance-related personnel actions with respect to management service employees.

Some cases have discussed the rationale and importance behind § 11–106 and its comprehensive scope. In *Maryland Reception, Diagnostic & Classification Center v. Watson,* 144 Md.App. 684, 691, 800 A.2d 16, 20 (2002), the Court of Special Appeals opined that the purpose of the statutory protections outlined in § 11–106 "can be discerned from an overview of the entire statutory scheme for imposing discipline on State employees: to prevent an appointing authority from imposing discipline on the basis of an unsubstantiated accusation." *See also W. Corr. Inst. v. Geiger,* 371 Md. 125, 144, 807 A.2d 32, 43 (2002) (stating that "[i]t is significant that one of the prerequisites for the imposition of discipline is the conduct of an investigation of the alleged misconduct"). In *Danaher,* the Court of Special Appeals affirmed this protective aspect of § 11–106 in the context of a management service employee. 148 Md.App. at 166, 811 A.2d at 375. In holding that the investigation undertaken by the employer pursuant to § 11–106 was deficient, the intermediate appellate court stressed that the statute's purpose, in part, was to provide an extra layer of protection, even with respect to at-will employees, to prevent the collateral consequences that may result when an employee is found culpable for "employee misconduct." *See id.* at 176–78, 811 A.2d at 381–82 (noting that, because Danaher, a 25 year veteran of state service, was found responsible for "employee misconduct" and thus terminated "with prejudice," he was subject to possible disqualification from employment with the State for up to three years).

Although we too acknowledge this protective characteristic of § 11–106, we are also mindful that its less than careful application has the potential to alter fundamentally the scope of at-will employment with respect to the management service. Nonetheless, the language of § 11–106 is clear: "Before taking *any* disciplinary action related to employee mis-

conduct, an appointing authority *shall* " follow specific investigatory procedures. (Emphasis added). Based on this plain and unambiguous language, we conclude that, if it appears that a disciplinary action may have been based, even *sub silentio,* on alleged facts constituting "employee misconduct," the "appointing authority" must be held accountable to follow the procedures outlined in § 11–106.[31]

Section 11–106 appears to be a sharp limitation on the discretion of the "appointing authority" to discipline its employees. With regard to at-will employees such as those in the management service, however, the statutory scheme provides the "appointing authority" with certain leeway in the disciplinary process. When the "appointing authority" seeks to impose disciplinary sanctions on a skilled or professional service employee, the State Personnel and Pensions Article and its regulations provide that the "appointing authority" bears the burden of proof. § 11–109; COMAR 17.04.05.01(G).

---

**31.** We recognize as an exception to this general principle that, even where there may be some factual basis upon which an argument may be mounted that consideration of "employee misconduct" figured in reaching the termination decision, the "appointing authority" may not have to fulfill the process in § 11–106 where it can demonstrate satisfactorily that it would have taken the disciplinary action in question regardless of the alleged "employee misconduct." This is not unlike certain federal statutory schemes, such as the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (2000), that provide employees with certain rights or protections against discrimination. The FMLA provides eligible employees the right to receive unpaid leave, with a right of reinstatement, for up to 12 weeks in the event of a serious medical condition. 29 U.S.C. § 2612. Although the FMLA prohibits an employer from taking any retaliatory actions, such as termination, against an employee as the result of the exercise of his or her rights under the statute, it does not prevent an employer from taking a disciplinary action if that action is shown to be unrelated to the exercise of rights under the FMLA. *See* 29 U.S.C. § 2614(a)(3) (stating that "[n]othing in this section shall be construed to entitle any restored employee to ... any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave"); *Geromanos v. Columbia Univ.,* 322 F.Supp.2d 420, 429 (S.D.N.Y.2004) (citations omitted) (stating that the "FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave").

When the "appointing authority" seeks to impose disciplinary sanctions on a management service employee, however, the State Personnel and Pensions Article and its regulations provide that the *employee* bears a burden of proof. § 11–113; COMAR 17.04.05.01(E)(1). When an employee in the management service claims that his or her discipline was unlawful because the "appointing authority" did not follow the specific procedures in § 11–106, the employee bears the burden of demonstrating that either the "appointing authority" did not follow properly the procedures in § 11–106 or that the disciplinary action was the result of some meaningful consideration by the "appointing authority" of uncharged "employee misconduct." [32] In the absence of such a demonstration, a termination or other discipline of an at-will employee, without a reason being given and without obeisance to the statutory procedures in § 11–106, is not unlawful necessarily.

In this case, we conclude that the Circuit Court erred, as a matter of law, in determining, on the pleadings and other papers before it, that Chairman Schisler, *sub silentio*, terminated Wilson for "employee misconduct" regarding the time sheet incident.[33] The only factual bases upon which the trial

---

**32.** For example, a reviewing tribunal might find "employee misconduct" was a significant factor in the decision to take a particular disciplinary action if the employee demonstrates a temporal proximity between the uncharged misconduct and the imposition of disciplinary sanctions.

**33.** It is appropriate to comment here on another aspect of the Circuit Court's disposition. The Circuit Court found that, because Wilson was terminated "for cause ... as a result of alleged misconduct," Wilson could only be terminated if the Commission followed the procedures outlined in § 11–106. One of the more integral aspects of § 11–106, however, is the provision stating that the "appointing authority" may not "impose any disciplinary action ... later than 30 days after the appointing authority acquires knowledge of the misconduct...." *See, e.g., Geiger*, 371 Md. at 144–45, 807 A.2d at 44 (holding that, "viewed in context, § 11–106 gives the appointing authority 30 days to conduct an investigation, meet with the employee the investigation identifies as culpable, consider any mitigating circumstances, determine the appropriate action and give notice to the employee of the disciplinary action taken"). It is clear from the record that Chairman Schisler acquired knowledge of the time sheet incident (and in his opinion, completed an

judge could have relied in reaching this conclusion were contained in the deposition of Chairman Schisler. No matter how Wilson torques extracted portions of the Chairman's responses, however, she failed to point to admissible facts supporting the claim that Chairman Schisler, to any meaningful degree, took the time sheet incident into account when he decided to terminate her.[34] A fair reading of the deposition, however, indicates that Chairman Schisler stated that, although he may have taken into account the performance issues relating to his opinion of Wilson's judgment, efficiency, and competency, he resolved to his satisfaction the time sheet incident without any disciplinary action, and it therefore did

---

investigation of such conduct) in late 2003. Assuming, for the sake of argument, that a majority of the Commissioners also acquired knowledge of the time sheet incident sometime prior to the re-termination, the Circuit Court's judgment tied the hands of the Commission with respect to its ability to terminate Wilson for that reason. The Circuit Court ordered that, because the alleged earlier conduct by the Chairman tainted the re-termination decision, Wilson may be terminated only if the Commission follows the statutory procedures in § 11–106. Under the plain language of the statute, however, the Commission would be barred from imposing any discipline, because it appears that more than thirty days passed since acquisition by the Chairman (and the Commission) of knowledge of the time sheet incident. Furthermore, as the Commission points out, the Circuit Court failed to identify any possible way for the Commission to remove or remediate the alleged "taint" perceived by the Circuit Court to be associated with the original termination.

**34.** Wilson emphasized in her brief and at oral argument that

[Chairman] Schisler testifies as a matter of fact that but for the misconduct issues (not the least of which is his allegation of fraud), he would not have terminated Ms. Wilson. As a result, she was terminated for cause as a matter of fact no matter how many times Chairman Schisler repeated the empty mantra that his *legal conclusion* is that she was not fired for cause, "in a legal sort of frame work" or that … he "didn't do the analysis with respect to a for cause termination."

The context of Wilson's pertinent question, as indicated *supra*, was whether Chairman Schisler would have terminated Wilson if she had not had any of the "personnel problems" discussed at the deposition "and was doing a fantastic job in [Chairman Schisler's] view across the board." The Chairman, however, never mentioned expressly the time sheet incident during his narrative explanation of his thinking about Wilson's tenure as the PSC's Director of External Relations.

not factor into his termination decision. Wilson understandably attempts to weave a different motive out of certain general statements and responses to hypotheticals. Nonetheless, we conclude that the re-termination of Wilson by a majority of the full Commission [35] was not unlawful as a result of its failure to follow the pre-termination statutory procedures in § 11–106.[36]

## V.

The Commission argues also that the Circuit Court erred when it found that the intra-agency post-termination adminis-

---

**35.** Wilson claims that her re-termination by a majority of the full membership of the Commission was unlawful because it was "tainted" by the original, unlawful 15 April termination. Wilson, however, presented no evidentiary basis tending to show that the other two relevant Commissioners (*i.e.*, those who voted with Chairman Schisler) considered the time sheet incident in voting to terminate her. Instead, she asserts that the absence of any evidence as to the relevant Commissioners' rationale indicates that those Commissioners shared Chairman Schisler's improper motives. The absence of any facts admissible in evidence as to the thinking of the other two Commissioners, however, is indicative only of Wilson's failure to discover or allege any factual support for her allegations. Our holding reflects our conclusion that, although the initial termination was unlawful because it was not effectuated by the full Commission, the re-termination was not unlawful as the result of the failure to follow § 11–106. Because Chairman Schisler's motive was not shown to be unlawful (and in fact may be irrelevant), no fact-finder could infer, under any theory advanced in this record, an improper motive on the part of the other two Commissioners.

**36.** Even if those portions of Chairman Schisler's deposition pointed to by Wilson were able to be read as sufficient to generate a triable issue that her termination was based on misconduct regarding the time sheet incident (a reading we do not adopt), it was error nonetheless for the Circuit Court to grant her motion for summary judgment. Under summary judgment analysis, the parts of the deposition to which the parties directed the trial court's attention would be viewed in a light most favorable to the non-moving, non-prevailing party. Thus, at the best for Wilson in this line of argument, the deposition generated factual conflicts as to the Chairman's basis for the initial termination. Such conflicts may not be resolved by summary judgment. In any event, the re-termination by the majority of the full membership of the Commission cannot be said to be infected with the same factual conflicts as are argued to appear from the Chairman's deposition alone.

trative appeal process was unconstitutional as applied to Wilson's case because it did not provide for an impartial agency adjudicator. Section 11–113 provides, in its entirety:

### § 11–113. Appeal to head of principal unit.

(a) *Applicability of section.*—This section only applies to an employee:

(1) in the management service;

(2) in executive service; or

(3) under a special appointment described in § 6–405 of this article.

(b) *Procedure.*—(1) An employee or an employee's representative may file a written appeal of a disciplinary action with the head of the principal unit.

(2) An appeal:

(i) must be filed within 15 days after the employee receives notice of the disciplinary action; and

(ii) may only be based on the grounds that the disciplinary action is illegal or unconstitutional.

(3) The employee has the burden of proof in an appeal under this section.

(c) *Conference.*—The head of the principal unit may confer with the employee before making a decision.

(d) *Disposition.*—(1) The head of a principal unit may:

(i) uphold the disciplinary action; or

(ii) rescind or modify the disciplinary action and restore to the employee any lost time, compensation, status, or benefits.

(2) Within 15 days after receiving an appeal, the head of the principal unit shall issue the employee a written decision.

(3) The decision of the head of the principal unit is the final administrative decision.

(e) *Expungement of personnel records.*—Within 15 days after issuance of a decision to rescind a disciplinary action,

the disciplinary action shall be expunged from the employee's personnel records.

 The Commission concedes that, because Chairman Schisler is the "head of the principal unit" with respect to the Commission, he is the proper, and ordinarily would be the, individual under the statutory scheme to hear an appeal by Wilson of her re-termination. Indeed, that view is confirmed by the direction in the 29 October memorandum to Wilson notifying her of her re-termination and directing her to file with the Chairman any appeal she might care to make. Wilson argues that, because the Chairman initiated her termination, he was biased against her of necessity. She maintains that, under Article 24 of the Maryland Declaration of Rights ("Article 24"),[37] she was entitled to a fair and impartial agency adjudicator.[38] We, however, need not reach or decide the

---

**37.** Article 24 of the Maryland Declaration of Rights, entitled "Due process," states:

> That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

**38.** In its 15 November 2004 order, the Circuit Court held that, not only was the review of Wilson's appeal by Chairman Schisler unconstitutional because he was not impartial, but that "neither the Chairman nor any of his employees may lawfully serve as an agency adjudicator regarding his own decision to terminate [Wilson]." Although § 11-113 provides explicitly that the appeal is to be filed with, investigated by, and disposed of by the "head of the principal unit," the Circuit Court does not make clear who, if anybody, in its view would be authorized, under the terms of its order, to hear an appeal of a proposed termination of Wilson. The Commission argues that, even though the re-termination letter stated that any appeal should be sent to Chairman Schisler in his position as "head of the principal unit," neither he nor it intended for him actually to consider and decide any such appeal. The Commission did not elaborate who, if not the Chairman, would consider and decide such an appeal had it been timely filed following the re-termination. *See, e.g., Spencer v. Bd. of Pharmacy,* 380 Md. 515, 533–34, 846 A.2d 341, 351–52 (2004) (evaluating alternatives for administrative agency to cure bias issues in hearing a contested case). The Commission, however, stated that, because Wilson did not pursue an administrative appeal of her re-termination, it was not called upon to resolve who or what entity that might not run afoul of the trial court's order would consider an appeal.

issue of whether Wilson was deprived unconstitutionally of a fair and impartial agency adjudicator because we conclude that she failed to invoke and exhaust the specific administrative remedy provided by statute when a management service, at-will employee of the PSC is terminated for other than misconduct. Therefore, she may not maintain in our State courts the claim she makes here.

### A.

In *SEFAC Lift & Equipment Corporation v. Mass Transit Administration*, 367 Md. 374, 380, 788 A.2d 192, 196 (2002), we elaborated on the exhaustion of remedies doctrine of administrative law:

> We have long held, and have recently confirmed, that "[w]here an administrative agency has primary or exclusive jurisdiction over a controversy, the parties to the controversy must ordinarily await a final administrative decision before resorting to the courts for resolution of the controversy."

(citations omitted). *See also Furnitureland South, Inc. v. Comptroller*, 364 Md. 126, 133, 771 A.2d 1061, 1065 (2001) (stating that, "where the Legislature has provided an administrative remedy for a particular matter or matters, there is a presumption that the Legislature intended such remedy to be primary and intended that the administrative remedy must be invoked and exhausted before resort to the courts").[39]

---

**39.** Neither the PUC Article nor the State Personnel and Pensions Article authorize a petition for judicial review of the Commission's final decision to terminate an at-will employee of the PSC. Undoubtedly aware of this, Wilson, in filing her complaint and amended complaint in the Circuit Court, sought judicial scrutiny of the Commission's actions through alternative legal vehicles. In both pleadings she plead for a declaratory judgment, a writ of mandamus, common law certiorari, and injunctive relief; however, skillful pleading may not avoid application of the doctrine of exhaustion of administrative remedies, for the reasons explained above. *See Converge Servs. Group v. Curran*, 383 Md. 462, 482, 860 A.2d 871, 882 (2004) (stating that "a preemptively or prematurely filed petition for declaratory judgment, where there is provided an exclusive administrative remedy for the subject matter,

In this case, § 11–113 provided a specific statutory administrative appeal process for certain categories of State employees, of which Wilson was one. Although Wilson apparently submitted an administrative appeal pursuant to § 11–113 following her initial termination, she failed to do so with respect to her re-termination, instead opting to file an unsuccessful motion to hold the Commission in contempt in the action in the Circuit Court arising from the initial termination. We find that, before Wilson could seek a judicial forum to resolve the disputes she seeks to raise with her re-termination, she was required to file and prosecute to a final administrative decision an administrative appeal under § 11–113.

This is not a mere reflexive application of the exhaustion doctrine. Whether such an appeal (and any issues as to illegality or unconstitutionality of the re-termination that may have been asserted) would have been considered and decided by the Chairman never will be known. *See* note 38 *supra.* The effort to mount the appeal may have been minimal (considering that much of the work from the prior appeal may have been recyclable), but the potential benefit to Wilson may have been great. Had the Chairman decided the appeal, as perhaps the re-termination notice implied would be the case, she would have taken from the Chairman and the Commission the argument they make here that the Commission intended to delegate that responsibility to another. By the same token, had she noted the appeal and it was delegated properly to an entity or person free of the alleged "original sin" of the Chairman, she may have gotten the impartial agency review she desired and would not have made the argument she now makes. In effect, by not filing the appeal, she enabled her

should not then be entertained [by the court], if at all, until the administrative remedy is exhausted"); *Josephson v. City of Annapolis,* 353 Md. 667, 681, 728 A.2d 690, 696 (1998) (stating that "the general rule ... remains that when administrative remedies exist in zoning cases, they must be exhausted before other actions, including requests for declaratory judgments, mandamus and injunctive relief, may be brought").

argument here, in the nature of an anticipatory breach of the right she claims.

Wilson argues that, because Chairman Schisler was involved in the termination and re-termination decisions and the former administrative appeal process, she need not exhaust the administrative process following re-termination because he was *unconstitutionally* biased against her. Although we recognize that a constitutional challenge to a statute or regulation on its face may provide an exception to the normal application of the exhaustion doctrine, we conclude that that exception is not applicable here because Wilson's constitutional challenge is framed as an "as applied" one.

Maryland courts long have recognized a "constitutional exception" to the exhaustion of administrative remedies doctrine. *See, e.g., Montgomery County v. Broadcast Equities, Inc.*, 360 Md. 438, 455–60, 758 A.2d 995, 1004–07 (2000) (chronicling the development and scope of the "constitutional exception" to the exhaustion doctrine and emphasizing that it is very "narrow"); *Shipp v. Bevard*, 291 Md. 590, 599, 435 A.2d 1114, 1118 (1981). In *Shipp*, we observed that:

> [W]hen there is an attack upon the constitutionality or validity of an enactment on its face, such case falls within a well-established exception to the principle that statutory administrative and judicial review remedies are normally deemed exclusive and must be pursued and exhausted. However, . . . when the attack is upon the constitutionality of an enactment *as applied* to a particular situation, as contrasted with an attack upon the validity of an enactment as a whole, the case does not come within the exception and the statutory administrative and judicial review remedies are ordinarily exclusive.

291 Md. at 599, 435 A.2d at 1118.

In this case, Wilson does not attack the constitutionality of § 11–113 on its face or as a whole, but rather as applied to the alleged facts of her situation. Her constitutional claim is premised on the particular facts of this case, *i.e.* Chairman Schisler's role in the initial termination action (and his partic-

ipation in voting, together with two other Commissioners, to re-terminate her) renders him unable to be fair and impartial in assessing whether the re-termination action was "illegal or unconstitutional." Of course, on this record, we have no way of knowing what arguments as to "illegality" or "unconstitutionality" of the re-termination Wilson might have made under § 11–113(b)(2)(ii) because she failed to offer them. Accordingly, it is difficult to analyze whether Chairman Schisler's disposition of an imaginary appeal of the re-termination would reflect impermissible bias, assuming he would have served as the "head of the principal unit" in considering and deciding it, rather than delegating the responsibility to some entity or someone free of prior meaningful association with Wilson's case (*see* note 38 *supra*).

Even in the case of the § 11–113 appeal taken by Wilson from the initial termination, which, as we noted earlier, this record does not contain the writing whereby she tendered her specific arguments, we are unable to detect any obvious impermissible bias from the Chairman's written disposition of her assumed contentions. Wilson's presumed arguments as to illegality or unconstitutionality made at that time, whether correctly or incorrectly resolved, were accorded reasonably detailed explanations for their rejection. Furthermore, the Chairman's responses were not flippant, frivolous, or facetious on their face. We are unwilling to assume the apparent premise of Wilson's argument that some kind of blind pride of authorship or hubris of power renders an administrative decision-maker *ipso facto* unable to assess fairly and objectively arguments that his or her decision should be revisited, changed, or abandoned. In the instance of the recusal of members of administrative bodies, we have refused to adopt a *per se* rule of recusal. *See Spencer,* 380 Md. at 534 n. 7, 846 A.2d at 352 n. 7. Because the record in this case does not reveal a factual predicate for specific personal bias against Wilson by Chairman Schisler, we shall not accept her invitation to excuse her failure to exhaust the specific administrative remedy made available to her by § 11–113.

## B.

As noted *supra*, Section 11–113 provides that, if a management employee wishes to appeal a disciplinary action, he or she must "file a written appeal ... with the head of the principal unit ... within 15 days after the employee receives notice of the disciplinary action." In this case, Wilson was given notice of her re-termination on 29 October 2004. She therefore was required to file a written appeal within 15 days of that date if she desired to contest the action taken against her on grounds of illegality or unconstitutionality. Wilson failed to do so, opting instead to file in the pending court action, on 4 November 2004, a petition to hold the Commission in contempt of court. As a result, Wilson allowed the relevant time period to expire without following the statutory directive under § 11–113. Application of the doctrine of exhaustion of administrative remedies bars her effort to seek alternative redress in the Circuit Court on the ground that the § 11–113 administrative remedy was unconstitutional as applied.

## C.

Wilson argues in her brief that, should we conclude that she was not terminated "for cause," we should remand this matter to the Circuit Court for further discovery and possible trial of her claim that she was terminated because of her political affiliation and/or beliefs in violation of Article 40 of the Maryland Declaration of Rights.[40] This claim too is precluded by her failure to exhaust her opportunity to take an administrative appeal of the re-termination decision. Although we conclude, as did the Circuit Court, that the initial termination of Wilson was unlawful because it was not effectuated by the "appointing authority," the re-termination was not

---

**40.** Wilson, alleging that she is a Democrat and a known supporter of former U.S. President William Jefferson Clinton, claimed that Chairman Schisler, alleged to be a Republican appointed Chair by current Maryland Governor Robert L. Ehrlich, Jr., also a Republican, fired her for partisan reasons. Further she alleged that her replacement, appointed by the Chairman, was a Republican vetted with the Governor's Appointments Office.

unlawful. Because Wilson failed to pursue the statutory administrative appeal process following the re-termination, she may not maintain her Article 40 claim on remand.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED.

CASE REMANDED TO THE CIRCUIT COURT WITH DIRECTIONS TO ENTER JUDGMENT, CONSISTENT WITH THIS OPINION, IN FAVOR OF APPELLANTS. COSTS TO BE DIVIDED EQUALLY BY THE PUBLIC SERVICE COMMISSION AND CHRYS WILSON.